# EDWARD H. PINDELL

## vs.

## HERMAN RUBENSTEIN ET AL.

*Impeachment of Witness—Hearsay—Action by Infant—Admissions by Next Friend—Gate Falling in Highway—Res Ipsa Loquitur.*

Where a witness testified that defendant's gate had fallen on plaintiff as the latter was passing along the highway, defendant could impeach the witness by showing that she had said that the gate fell because plaintiff climbed thereon, she having been first asked whether she had not made such contradictory statement to a designated person at a certain time and place.                                                                   p. 574

Admissions made by plaintiff's mother, subsequently named as next friend for the purpose of the suit, as to the responsibility for the accident to plaintiff, were not admissible against the latter.                                   pp. 575, 576

A witness cannot be impeached by evidence of inconsistent statements made by her, if such statements, being incompetent as hearsay, are not a proper subject for cross-examination of the witness.                                           p. 576

In an action on account of injuries caused a child, while being led along a highway, by the fall of a gate in defendant's fence, *held* that there was sufficient evidence to go to the jury as to defendant's negligence in not properly securing the gate.
p. 577

The grant of a prayer that the burden is on plaintiff to establish by a preponderance of evidence that the gate was in a defective condition and that this was or should have been known to defendants; that plaintiff's injuries were directly due to such condition, and that defendants were negligent in failing to repair the gate, and, if the minds of the jury are in even balance either as to whether the gate was in defective condition, that the injuries were directly due to such condition, or that defendants were negligent in failing to repair the

gate, they will find for defendants, *held* erroneous but not cause for reversal.                                    p. 577

Where a person lawfully in the use of a public highway is injured by the fall of an object within the exclusive control of the defendant, which was maintained by him in such a condition that he might reasonably have expected it to fall in the highway, a *prima facie* presumption of negligence arises from the accident itself, taken in connection with the circumstances under which it occurred.                              pp. 578, 579

The testimony of witnesses that an eye-witness of the accident had made a statement to them contradictory of her testimony as witness, while admissible as affecting her credibility, is not in itself substantial evidence of the facts referred to in the statement attributed to her.                              p. 580

An instruction unsupported by any legally sufficient evidence should not be granted, when objection is specifically made to it on that ground.                              p. 580

An abutting owner cannot maintain a structure immediately adjacent to the highway in such a position that a person travelling on the highway could, by merely taking hold of it, cause it to fall and injure him, without being guilty of negligence and responsibility for the damage thus caused.                              p. 580

That a gate abutting on the highway was a private entrance leading into defendants' yard did not relieve them from the duty of keeping it in a safe condition in order to avoid injury to people pulling or taking hold thereof.                              pp. 579, 580

*Decided December 2nd, 1921.*

Appeal from the Superior Court of Baltimore City (AM-BLER, J.).

Action by Edward H. Pindell, an infant, by Bertha Pindell, his mother and next friend, against Herman Rubenstein and Dora Rubenstein, his wife. From a judgment for defendants, plaintiff appeals. Reversed.

Defendants' second prayer was as follows:

The jury are instructed that the burden is on the plaintiff to establish by a preponderance of the evidence that the gate mentioned in the evidence was, at the time of the accident mentioned in the evidence, in a defective condition and that such condition was or should have been known to the defendants; that the injuries mentioned in the evidence as having been received by the infant plaintiff were directly due to such defective condition and that the defendants were negligent in failing to have said gate repaired prior to said accident and, if their minds are in even balance with regard either to whether or not said gate was in such defective condition, that the injuries alleged to have been received by said infant plaintiff were directly due to such defective condition or that the defendants were negligent in failing to have said gate repaired prior to said accident, they will find their verdict for the defendants.

The cause was submitted on briefs to BOYD, C. J., BRISCOE, THOMAS, PATTISON, ADKINS, STOCKBRIDGE, URNER, and OFFUTT, JJ.

*Harry O. Levin,* for the appellant.

*J. Calvin Carney, C. Milton Dickerson* and *Dickerson & Nice,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

The appeal in this case was taken from a judgment of the Superior Court of Baltimore City, entered in an action on the case brought by the infant plaintiff against the appellees, to recover damages for injuries which are said to have resulted from the fall of a gate in a fence along the appellees' premises on the Calverton Road, a public thoroughfare in Baltimore City.

Since the legal sufficiency and the legal effect of the evidence is involved, it is necessary to refer in some detail to

the facts of the case and the testimony given in respect to them.

Edward H. Pindell, on July 17th, 1920, was not quite three years old. His mother, who then lived at No. 14 South Calverton Road, on that day sent him to a nearby store with her younger sister, Winona Seymour, then about ten years old. On their way to the store the two children went along the street by the appellees' property, and which was separated from it by a wooden fence, in which there was a wooden gate about five or six feet high. As they passed this gate, it fell and struck the infant plaintiff, breaking the "large bone of the left leg" in three places, "and the small bone in two."

There was no direct testimony as to the actual happening of the accident except that of Winona Seymour. When asked to tell what happened, she said: "July 17th, my sister sent me to the grocery store to get a needle and we walked by the gate and the gate fell on him." She was then asked: "Were you holding Edward's hand?" and she answered: "Yes, sir." After testifying that she was holding Edward's right hand with her left, and that he was walking on the side next to the gutter, and that she was between him and the fence, she was asked to further describe their relative positions, and in reply she said: "He was holding my hand and he was in back of me," and when asked to tell what happened, she answered: "As we were walking down the street, well, I heard him scream, and when I looked back the gate was on him, and I slid the gate off and picked him up and carried him in the store." She further testified that the gate was a heavy wooden gate and was "off the fence." She carried the child to the store and then carried him home and handed him over to his mother. On cross-examination she said she did not actually see the gate fall, as Edward was about two feet behind her at that time; that when she first saw Edward after the accident he was lying on his back with his face towards the fence, with the gate "on all of him but his head," and that, while the gate did not hit her, she "was only a little

ways from it," and that "she and Edward were walking up
close to the gutter." She further testified that the gate was
made up of a number of strips "running up and down" and
led into the appellees' yard. She was then asked a number
of questions designed to show that when she went into the
appellees' store with the child after the accident she had said
to Mr. Rubenstein, one of the appellees: "It was not your
fault; Edward climbed up on the gate and pulled it over on
him"; and she in reply to these questions denied having made
the statements.

Martin J. Scharf, a blacksmith's helper, who worked at
the time across the street from the appellees' store, testified
that the Calverton Road is about thirty feet wide at that
point, that he had seen the gate in the fence lining Mr.
Rubenstein's place, and that "he saw the gate off the hinges
nearly three weeks and that they would have to take it off
the latch and lift it over in order to open it up"; that he saw
the garbage and the ice man and Mr. Rubenstein himself
open it that way; that it was off its hinges before and at the
time the boy was hurt; that there were T-hinges at the top
and bottom of the gate from which the screws were missing;
that he saw the gate lying on the child and saw the little girl
move it and carry the child into the store; that the gate or
the hinges "were afterwards fixed"; that it blew down in a
wind storm and about a week after the accident Mr. Ruben-
stein "came over and borrowed a hammer and fixed it up."
On cross-examination he said that the gate was opened by
lifting it around; that the "fence part" of the hinges was
loose, and the gate was held in place by a latch.

Joseph O'Connell, foreman for a firm of contractors, en-
gaged in the business of constructing cement alleys, and who
is a brother-in-law of Mrs. Pindell, testified that he noticed
the gate particularly on the Monday before the accident, and
at that time the top hinge was gone and the bottom hinge
"just set up in place," with one old rusty screw in it, and
that the part that "hooks on the fence was not hooked, just

set in place," and that on the day the boy was hurt he again saw the gate and it was in the same condition. On cross-examination, after going over in greater detail the facts referred to above, the witness was asked why he had examined the gate so carefully on the Monday before the accident and he replied: "Because I could look at the top hinge, and I know the gate was going to fall on me. It was dangerous." He afterwards said that he did not know it was going to fall on him because he did not get "that close to it." He further said he did not speak of the condition of the gate either to Mrs. Pindell or to Mr. Rubenstein.

William A. Calvert, a carpenter, said that about ten months before the date of his testimony (June 25th, 1921,) while at work for Mr. Rubenstein, he had occasion to use the gate, that then it was hanging on a staple and to open it he had to pick it up and carry it around and lean it against the fence; that the bottom hinge was off the gate and the top hinge on; that when he went through he closed it and went inside and hooked it, and then it was safe. On cross-examination he said that the wood in the gate was sound, and that when closed and hooked from the inside, as he left it, it was safe, and would not have fallen unless pulled over or pushed; that it would not fall unless it were unhooked.

Dr. Edward F. Grempler, a physician, testified to having examined the boy, and as to the nature and extent of his injuries, from which he said he had fully recovered.

Mrs. Bertha Pindell testified that she had sent her sister and the little boy to the defendants' store for a needle; that she knew nothing of the accident until she heard the child screaming when her little sister brought him in, a short time after they had gone out. She also described the care and attention which the child had and the medical and surgical treatment which he received. On cross-examination she was asked first whether she had not told Mrs. Rubenstein that Winona her sister had told her that Edward was climbing on the gate and it fell on him; second whether she had not

made a similar statement to "the lady upstairs," and in response to these questions she denied having made such statements, and also denied that her sister had told her that Edward was climbing on the gate.

On behalf of the defendants, the testimony of Mrs. Lola Smith, John F. Malone, Lillian Rubenstein, a daughter of the defendants, Herman Rubenstein, and Dora Rubenstein, was offered to prove that Winona Seymour had said that Edward had climbed on the gate, and that Mrs. Pindell had said that Winona had made that statement. In addition to that testimony, Mr. Rubenstein said that he had never seen anything wrong with the hinges on the gate at all, that up to the time of the accident he never saw anything about the gate out of order; that the wood of the gate and the fence was in good condition, that he examined the gate the day it fell, and that the screws in parts of the hinges which had been fastened to the fence had pulled out, but the wood of the fence was sound, and that on the day of the accident he had nailed the hinges back in place.

At the conclusion of this testimony the plaintiff offered one prayer, which was granted, and the defendants six, of which the second, fourth and sixth were granted. To the granting of the sixth prayer the plaintiff specially excepted, and the rulings of the court in overruling these special exceptions and in granting the defendants' prayers are the subject of the sixth exception, while the remaining exceptions relate to questions of evidence. These exceptions we will now consider.

In the cross-examination of Winona Seymour, she was asked if, when she went into the appellees' store after the accident, she had not said to Mr. Rubenstein, "It is not your fault; Edward climbed on the gate and pulled it over on him," and she denied having made the statement. The defendants offered to prove by several witnesses that she had made the statement on that occasion, and that testimony was admitted over the plaintiff's objection. The admission of

this evidence is the subject of the first, third and fifth exceptions. We find no error in these rulings. The witness, Winona Seymour, had testified that the gate fell on the boy as he was passing by it. A statement that it fell over because he climbed upon it was inconsistent with that testimony, and was admissible for purposes of impeachment, provided a proper foundation was laid for its admission, as was done in this case, by asking the witness on her cross-examination whether she had not made the contradictory statement to a designated person and informing her of the time and place when it was supposed to have been made. 28 *R. C. L.* 633; *Caledonian Ins. Co.* v. *Traub,* 83 Md. 524.

Mrs. Pindell on cross-examination was asked this question: "Did you tell the lady upstairs that Winona had told you that the little boy was climbing on the gate?" She denied having made the statement, and the defendants then called Mrs. Lola Smith and having proved that she lived on the second floor of the house in which Mrs. Pindell lived at the time of the accident, was asked: "Did the mother of the little boy make any statement to you as to how the accident happened?" An objection to this question was overruled and the witness said that Mrs. Pindell had made such a statement to her on the day of the accident. She was then asked to tell what that statement was. Counsel for the appellant again objected, but the court directed the witness to answer, and she said: "Mrs. Pindell says to me, as I went out I said to her, I asked her how little Edward was, and she told me she sent Winona and Edward over to the store to get a needle, and Winona was walking in the street and Edward walking on the pavement and pulled on the gate and the gate fell on him, and she told me, I said to her, 'Why don't you go over and see Mr. Rubenstein?' She said, 'I have been over there, and Mrs. Rubenstein volunteered to get the doctor, and she would do all and pay all that was necessary for the child.'" Some question has been made as to whether the exception noted to the court's ruling applied to this evidence, but in view of the statement

of the learned and careful judge who tried the case that it was subject to the exception, we will treat the exception as valid.

Mrs. Pindell was also asked on cross-examination if she had not on the day of the accident made a similar statement to Mrs. Rubenstein, and she denied having done so. The defendants offered to prove by Mr. Rubenstein that she had made such a statement to him and he was allowed to testify, over the plaintiff's objection, that Mrs. Pindell told him that she knew it was not his fault, that while she was not there when the accident happened the little girl told her. These rulings are the subject of the second and fourth exceptions. There was in our opinion prejudicial error in these rulings. Mrs. Pindell had positively disclaimed any knowledge of the accident or the instrumentality which caused it. Anything which she may have said therefore as to it was necessarily hearsay, irrelevant and collateral to any issue involved in this case. She was in no sense a party to the cause within the meaning of the rule permitting evidence to be given of admissions against interest made by a party, and her admissions were not competent to affect the interest of the infant whom she represented. 22 *C. J.* 353; *Jones, Evid.,* par. 266; *Baltimore City Pass. Rwy. Co.* v. *McDonnell,* 43 Md. 534. In the case last cited, which was an action by an infant plaintiff to recover for personal injuries received in a street car accident, the defendant offered to prove that the infant plaintiff's father and *prochein ami* had said in speaking of the accident, that he did not blame the driver at all and that the child was injured by a pure accident. The offer was rejected and in discussing that ruling this Court said: "McDonnell, whose declaration was not permitted to go to the jury, was not present when the accident occurred, saw nothing of it, and had no knowledge of the particulars of the accident, further than information derived from others, and any declarations he may have made, must of necessity have been based exclusively upon information derived from others, and were not

admissible evidence to affect the interest of, or bind, the plaintiff. The declaration offered, was made by a person having no legal interest in the suit before the suit was commenced, and without any knowledge of the transaction, other than what was derived from other persons. Such a declaration stands upon the same footing with declarations made by a person, to whom letters of administration are afterwards granted, which are not admissible in evidence against him as administrator." Nor could the fact that on cross-examination she denied having made the statements authorize the introduction of evidence tending to show she had made them, because since they were only hearsay, and therefore irrelevant and incompetent, and as she could not bind the infant plaintiff by making them, it was wholly aside from any issue in the case whether she made them or not, and, as was said in *Sloan* v. *Edwards,* 61 Md. 105: "It is true, the credit of a witness may be impeached by proof that he has made statements out of court, inconsistent with his testimony given in court. But it is a general rule that a witness cannot be cross-examined as to any fact, which, if admitted, would be wholly collateral, and irrelevant to the matters in issue, for the purpose of contradicting him by other evidence, and in this manner to discredit his testimony. And if the witness answer such an irrelevant question without objection, evidence cannot afterwards be admitted to contradict his testimony on the collateral matter. 2 *Phill., Evid.,* 398; *Goodhand* v. *Benton,* 6 G. & J. 481; *Att'y Gen'l* v. *Hitchcock,* 1 Exch. 91, 101."

This brings us to the sixth exception, which deals with the rulings on the prayers. The defendants' second, fourth and sixth prayers were granted and their first, third and fifth refused. Before discussing the defendants' granted prayers, we will consider the court's action in refusing their first prayer, which was a demurrer to the evidence in the usual form, since the question of whether the appellant was prejudiced by the court's rulings on the remaining prayers depends to some extent upon the correctness of its ruling on that prayer

The testimony shows that while the infant plaintiff, then less than three years old, was being led along one of the public highways of Baltimore City, he was struck and injured by a gate which fell from its place in the defendants' fence, because it was insecurely and insufficiently fastened. This conclusion is fairly inferable from the evidence, the truth of which, in this inquiry, we assume. At the time of the accident the boy and the little girl were in the highway and walking along it and by the gate. The girl was holding the boy's hand and was between him and the fence. He was lagging behind her at a distance of about two feet. She had passed the gate, and he was in the act of doing so, when she heard him scream, and found that the gate, which an instant before had been in place, had fallen on the boy and that he was then beneath it. The gate had not been securely fastened in place for weeks and was described by a witness as "dangerous." It had but one hinge and that was not fastened to the fence at all, so that the gate was held in place only by a latch or a hook and, when that was not fastened, there was nothing whatever to hold it in place except its own weight. Under such circumstances and in the absence of any evidence to show why it fell at that time, it cannot be said that there was no evidence in the case legally sufficient to show that the child was injured whilst in the lawful use of the highway by the fall of a gate from defendants' premises, and that such injury was due to the defendants' negligence in permitting their property to be in such a condition that it could in that manner injure persons lawfully using the highway. In our opinion therefore, this prayer was properly refused.

No objection to the defendants' second prayer, which was granted, was urged in this Court, either in the printed or the oral argument and, while we cannot approve its form or the legal proposition embodied in it, we do not under the circumstances of this case find any reversible error in the ruling as to it.

The most important question presented by the appeal grows out of the granting of the defendants' fourth and sixth prayers.

The fourth prayer, which instructs the jury that no presumption of negligence arises from the mere happening of an accident, and that the burden was on the plaintiff to prove that it was occasioned by the negligence of the defendants, was, under the circumstances of this case, not only misleading but incorrect, because if the plaintiff's evidence is accepted, this is one of that class of cases in which it may be inferred from the mere happenning of an accident, when taken in connection with the circumstances surrounding it, that it was due to a breach of some duty on the part of the person controlling or responsible for the agency causing it, for while it is true that, in every action for damages arising from negligence, the plaintiff is bound to prove the negligence and the damage complained of as a consequence thereof, yet where, as in this case, it appears from the plaintiff's evidence that a person lawfully in the use of a public highway was injured by the fall of an object within the exclusive control of the defendant, which was maintained by him in such a condition that he might reasonably have expected it to fall in the highway, just as it did in this case, a *prima facie* presumption of negligence arises from the accident itself, when taken in connection with the circumstances under which it occurred. As was said by JUDGE THOMAS, speaking for this Court: "The free and unobstructed use of the public streets is a right that belongs to the public, and it is the duty of those owning and occupying property abutting on a highway to so use their property and keep it in repair as not to endanger the public while in the exercise of that right." *Weilbacher v. Putts Co.,* 123 Md. 255. And when a person, while in the exercise of that right, is struck and injured by the fall of some object from the defendant's premises and under his control, in the absence of any explanation, that fact alone is sufficient to create a presumption of a violation of that duty. The application of these principles is illus-

trated by a number of cases decided in this and other courts. In *Heim v. Roberts,* 135 Md. 600, where the infant plaintiff was injured by the fall of pieces of lumber which slipped from a lumber pile in the street along which he was walking, it was held that negligence could be inferred from the mere happening of the accident in connection with the surrounding circumstances, in the absence of any testimony explaining it. In *Strasburger v. Vogel,* 103 Md. 89, where the plaintiff was injured while on a public highway by the fall of a brick from a nearby house, the same conclusion was reached, and to the same effect is the case of *Murray v. McShane,* 52 Md. 217, in which the plaintiff, while on a public street, was struck and injured by the fall of a brick from the wall of a house abutting on the street.

In 20 *R. C. L.* 78, it is said: "It may be stated as a general proposition that the owner or occupant of a building or structure, unless he can show that he was not at fault, will be held liable for damages and injury resulting from the precipitation of objects or substances into the street or upon adjacent premises," and in a note to the case of *Soriero v. Penn. R. Co.,* Ann. Cases, 1916 E, p. 1073, it is said: "The cases are nearly all in accord with the holding of the reported case that where a person lawfully in the street is injured by the fall of a wall or a portion thereof the doctrine of *res ipsa loquitur* will be applied," and a great variety of cases supporting and illustrating the rule are there collected. Since therefore, under the circumstances of this case as disclosed by the evidence upon which the plaintiff relied, an inference of negligence could have been drawn from the happening of the accident itself, in connection with such circumstances, it was error to instruct the jury to the contrary, and the defendants' fourth prayer should not have been granted.

There was also error in granting the defendants' sixth prayer, by which the jury were told that if the gate was a private entrance leading into the yard of the defendants, "no duty rested on the defendants to keep said gate in a safe condition in order to avoid injury to people pulling or taking

hold of said gate." The plaintiff specially excepted to the prayer on the ground that there was no evidence legally sufficient to show that "the infant plaintiff pulled upon or took hold of the gate." There is in fact no such evidence in the case, for the testimony of the witnesses that Winona Seymour, the only eye witness of the circumstances under which the accident occurred, had said that the plaintiff had climbed upon the gate, had no effect other than to impeach her credibility by contradicting her, and was not in itself substantive evidence of the facts referred to in the statement attributed to her. 40 *Cyc.* 2964; *Mason v. Paulson,* 43 Md. 161; *Jones, Evidence,* par. 858. While the prayer is a mere abstraction and does not submit to the jury the question as to whether the infant plaintiff pulled or took hold of the gate as suggested by the special exception, yet an instruction unsupported by any legally sufficient evidence in the case should not be granted, when objection is specifically made to it on that ground, as was done in this case. *Marshall v. Haney,* 4 Md. 498.

But aside from that, the legal proposition embodied in the prayer is unsound and contrary to reason, and is unsupported by authority. The general rule is that it is the duty of an abutting owner, maintaining structures along and adjacent to a highway, to use reasonable care to see that they are kept in such a condition as not to endanger the safety of persons engaged in the reasonable and lawful use of the highway. 13 *R. C. L.* 424-427; *Weilbacher v. Putts Co., supra; Hussey v. Ryan,* 64 Md. 426; *Murray v. McShane, supra.* In measuring the extent of that duty we must be mindful of the fact that the public highways are the common and universal avenues of travel and communication for the entire public, and they may lawfully be used by children of tender ages, by the aged and infirm and by persons suffering from physical disability. Having in mind those considerations, it would be unreasonable to hold that an abutting owner could maintain a structure immediately adjacent to the highway in such a position that a person travelling along the highway could by

merely taking hold of it cause it to fall and injure him, without being guilty of negligence and responsibility for the damage thus caused. Such a theory would, in the light of common experience of the manner in which highways are used, be contrary to the public safety and welfare. Persons may touch or even take hold of the structures lining a public highway under an infinite variety of circumstances without being thereby guilty of negligence. As for instance a traveler might stumble or make a misstep, or be suddenly overcome by illness and lean or take hold of the structure for support, or in the case of a child it might touch or take hold of it thoughtlessly. And in doing these commonplace and ordinary things such persons cannot lawfully be subjected to the perils of serious bodily injury through the collapse or fall of the object thus casually touched or grasped merely because it was not actually within the highway, but on the contrary the maintenance of such dangerous agencies, which may be little else than traps, constitutes a violation of the duty owed by the abutter to the public. For the reasons given in our opinion the defendants' sixth prayer should not have been granted.

Because of errors in the rulings involved in the second, fourth and sixth exceptions the judgment appealed from must be reversed.

> *Judgment reversed, with costs to the appellant,*
> *and cause remanded for a new trial.*