## JOHN J. CARLIN v. SADIE SMITH.

*Amusement Device—Negligence in Operation—Necessity of Inspection—Questions for Jury.*

In order for one, injured while patronizing an amusement device, to recover against the proprietor thereof, it must affirmatively appear that the injury resulted from the proprietor's failure to use reasonable care, under all the circumstances, to carry plaintiff through the device.                    p. 531

The proprietor of an amusement device is not an insurer of the safety of his patrons, nor is he bound to protect them against such obvious risks as are necessarily incidental to the particular device, but he must use reasonable care and diligence to see that the device is properly constructed, and is maintained in a fit condition for the purposes for which it is used, and is managed by agents of competent skill with that degree of care which an ordinarily prudent person would exercise under like circumstances and in a like situation.                    p. 531

Where plaintiff, as patron of an amusement device, paid the fare and, after an assurance of its safety, but without any knowledge of its operation, placed herself under the exclusive care and control of defendant's agents operating the device, and while this relation continued, an accident occurred to her that, in the ordinary course of things, was such as does not happen, if those who have the construction, maintenance, or management use reasonable care and diligence, the occurrence of the accident was sufficient to carry the case to the jury to determine whether the accident arose from want of reasonable care.                    p. 531

An expert, who had constructed and operated defendant's amusement device, in which plaintiff was injured, having testified that certain bolts or nuts should be gone over and tightened every day, and that it should be seen that everything was in trim before starting the day's operation, the fact that defendant's employee merely listened, on starting the machinery, to

hear anything "click," and did not tighten the bolts and nuts daily, *held* evidence of negligence to go to the jury. pp. 533, 534

If one patronizes an amusement device, whose operation and nature are unknown to him, but of the safety of which he is assured before he trusts himself wholly to the care of the proprietor as regards its operation, and an accident happens which is due to one of a number of causes, which all involve blame to the proprietor, he is not exonerated because the matter may be mixed in such confusion that he cannot accurately specify which of the possible causes of injury is the actual one.  p. 534

In an action for injury to the patron of an amusement device, consisting in part of a moving canvas belt on which the patrons slid, upon the unexpected tilting of a bench on which they were seated, the injury to plaintiff resulting from her coming in contact with some hard object as she slid from the bench to the belt, *held* that in view of the nature of the accident, with its accompanying circumstances, and of independent evidence of lack of care on the part of defendant, proprietor of the device, it was proper to submit the case to the jury.

pp. 528-535

*Decided June 11th, 1925.*

Appeal from the Court of Common Pleas of Baltimore City (SYMINGTON, J.).

Action by Sadie Smith against John J. Carlin. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, and WALSH, JJ.

*Edgar Allan Poe* and *Robert D. Bartlett,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*Robert R. Carman* and *Saul Praeger,* with whom was *G. C. A. Anderson* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The appellee, Sadie Smith and her husband, John R. Smith, Arthur G. Fuller and Ethel Fuller, his wife, and

Fred W. Mills and Thelma Mills, his wife, formed a party which was enjoying, on September 3rd, 1923, the various forms of amusements maintained by John J. Carlin, the appellant, at "Carlin's Park," Baltimore, for the use and diversion of the public. They had visited the resort before, and knew the general form of entertainment which the place afforded. After the party had tried many of the mechanical devices maintained by the proprietor, they came to one which was called "Just for Fun," which had an entrance in imitation of an opening into a rock cave, but everything else was concealed. An attendant was in charge, who cried an invitation, but the members of the party were ignorant of the nature of this device, and there was nothing visible to give them a clue, and they hesitated. Mrs. Fuller said to the attendant: "What kind of a place is that? I am afraid to go in there. Is it safe?" The attendant answered: "Why, certainly, it is safe; if it wasn't safe, we couldn't afford to run this place." The six then bought tickets, and went into the device, walking through a passage, with dark places, slanting floors and shaking floors, until a door was reached, where another attendant was stationed, who stopped the party with the statement that only two were allowed to pass through the door at a time.

The appellee and her husband were the first pair to go through the door into a small dark room, which apparently had four walls, and a fast floor, and which was painted in the semblance of an elevator. The only thing in the room was a smooth wooden bench, against the back wall. The attendant directed the appellee to sit on the bench, and the husband to put his arms around his wife. While in this position, the appellee was again assured by the attendant that the device was safe; the door was closed, and the husband and wife were alone in the darkness with no idea of what was going to happen and with no opportunity to see or know anything of the hidden mechanism with which the device was operated. Suddenly, without any warning, the bench on which they were seated dropped, and the floor fell

from under their feet, and they, according to their testimony, were hurled with such force and precipitancy from the bench that they shot, helpless and recumbent, upon a moving endless canvas belt, which carried them down the length of an undulating decline of sixty-one feet.

As the appellee was propelled from the bench and cast upon the canvas, she was hurt by being struck a blow on the end of her spine. She described it as a "terrific blow—it was enough to hurt her terribly." The appellee cried out in pain when she was injured, and an attendant called to her to sit up on the moving canvas, but she was unable to obey, and was held in the arms of her husband until the end of the canvas belt was reached, where the attendant caught her.

The attendant asked if the appellee wanted to be taken to a doctor, but she said no; and the party left for their homes in Cumberland. The appellee continued to suffer, and, while on the way, the women examined her body and found a bruise at the end of her spine, where the blow had been inflicted. When she reached home a doctor was summoned, and an examination was made. The doctor saw the bruise, and discovered that she had sustained a fractured dislocation of the coccyx, which is the small terminal bone of the spine. After some months the fracture healed with callous, in a deformed or angulated position and with a slight lateral displacement of the lower fragment of the coccyx. The injury is painful and permanent, unless relieved by a surgical operation, which was not advisable on account of her general physical condition.

It is for this serious injury that the appellee recovered a verdict of $15,000 against the appellant in the Court of Common Pleas of Baltimore City. The appeal seeks to have reviewed four rulings. Three of these rulings are on the evidence and the fourth is on the prayers. As the principal question is whether there was error in the court's refusal to direct a verdict for the appellant, the testimony bearing on that point will be stated.

"Just for Fun" was one of those contrivances designed to

attract and amuse the public by providing a succession of amusing, exciting, and ridiculous situations and experiences, through simulated dangers and surprising and bewildering conditions, whose thrills and alarms were to be enjoyed in the confidence that no latent peril attended their creation. The culmination of "Just for Fun" was when the small room was entered. It seemed an elevator. This illusion was produced by its walls being painted to represent one, and by two small electric light bulbs, which, if lighted, did not prevent the interior from being dark. ·

The room was six feet high, and was four feet by five feet in size. The side and back walls were stationary. Against the back wall of the room was a wooden bench with a smooth polished surface, forty-two inches in length, and sixteen inches wide, and twelve inches above the floor of the room. The seat was one inch thick, and it had a solid oak back. The front wall and the floor of the room were built as a unit and formed a right angle. By means of secret mechanism, which was operated from the outside of this chamber, the apparently stable front wall, floor and bench were movable at the will of an operator of the appellant, who, unseen, could look through an opening into the room.

Immediately under this floor of five by four feet was a pad about five feet square, and from eight to ten inches thick. The top of this pad was four inches below the floor of the room. Beyond the pad and, also the front wall of the room was a smooth undulatory wooden surface or incline sixty-one feet in length, which had a drop of nine feet between its beginning and end. At the peak of each of the successive undulations, which were about eight feet apart, parallel wooden rollers were set across the wooden surface, with the ends turning in blocks, so that the revolving surface of every roller was, when properly adjusted, in perfect alignment with the surface of the undulations. At either extremity of this wooden incline was a transverse, wooden roller, whose revolving top surface was intended to be in line with the end of the device. The higher of these two rollers, which may be

identified by calling it the second roller, was fourteen inches in diameter, and seven feet from its axis, and parallel to this second roller, and on the same level, was the center of another wooden roller, which will be called the first roller.

An endless five or six ply canvas belt, which was about two hundred and ten feet long, sixty-eight or sixty-nine inches wide, and which weighed six hundred pounds, and was propelled by an electric motor, traveled over and under the wooden undulatory surface of the incline at rapid speed, in contact with the terminal rollers and with the other rollers, which last served only to relieve the friction of the contact of the belt with the surface of the wooden incline. But in the distance of seven feet between the first and second rollers, which was directly under the floor of the room, the canvas belt passed under the floor and over the pad which has been described. Underneath this floor was attached a projecting wooden roller, four inches in diameter. When the walls of the room were in contact, this last mentioned roller pressed down the canvas belt, so that, under this floor, the belt was forced four inches out of alignment and barely escaped the top of the pad as it ran.

So long as the device was properly maintained and worked, when the operator pulled the lever and pushed down the latch at the same time, the seat of the bench tilted forward forty-five degrees in an arc of sixteen inches, and the floor dropped away, while it and the front wall moved upward in an arc of seven feet, so that the pressure of the roller attached to the floor was released, and the canvas belt rose four inches to run on the level of the top line of the first and second rollers, which was four inches above the level of the top of the pad. The usual time for these concurrent movements was five seconds, at the end of which the front lower edge of the bench should be in contact with the surface of the canvas belt, as the occupants of the seat were slid easily off onto the moving canvas belt not more than five feet from the axis of the second roller, over which, and then down the

sixty-one feet of the undulatory incline, the passengers were carried by the belt in twelve seconds.

In order to maintain the tension necessary to pull the canvas belt and to take up the slack in the canvas belt, there was a weighted tightening idler with two long eccentrics at the bottom in the machinery room. It was also shown by the appellant's testimony that the purpose of the pad was to protect a passenger from injury when he was tilted from the seat, if the belt sagged for any reason, as the constructor of the device was afraid that the belt would give way at times. The proof is that it did occasionally come in contact with the belt.

It is clear that the normal operation of this mechanical device was designed to cause the persons on the bench gradually to slide off a slowly tilting seat upon the taut, moving canvas belt, at the distance of about five feet from the second large wooden roller, toward and over which they would be carried down the undulatory surface of the slide without contact with the rollers or any other part of the device except the continuously running endless canvas belt. It is also obvious that this safe functioning of the various parts of the device necessarily depended upon their constant co-ordination while being used; and that this harmonious working could not be secured without care on the part of the proprietor not only in the inspection and maintenance of the mechanism of the device but also in its operation by the attendant. One of the witnesses produced on the part of the appellant testified that the floor bolts or nuts had to be tightened every day, and that "the men are supposed to go over them and look at the blocks and bolts and see everything is in first-class shape before opening up."

The large number of patrons who were shown to have enjoyed the pleasure and excitement of the amusement device without mishap is evidence that, while reasonable care existed, the device was not inherently dangerous. But the fact that no accident had happened while care was being exercised is not evidence that an accident would not happen

when that care was withdrawn. The exercise of due care was a cause of safety. If the device did not work safely, as the appellant's own testimony demonstrated it should have done under the circumstances of its use by the appellee, it was obviously through some neglect of the appellant, and not through any default of the appellee, who had fully complied with all the instructions of the appellant's servants. But in order for the appellee to recover, it must affirmatively appear that the injury complained of was the result of a failure on the part of the appellant to use reasonable care, under all the circumstances, to carry the appellee in safety through the amusement device which was operated by the appellant. The proprietor is not an insurer of the safety of his patrons nor is he bound to protect them against such obvious risks as are necessarily incidental to the particular amusement device, but he must use reasonable care and diligence to see that the device is properly constructed, and is maintained in a fit condition for the purposes for which it is used, and is managed by agents of competent skill with that degree of care which an ordinarily prudent person would exercise under like circumstances and in a like situation. *Albert v. State,* 66 Md. 337; *New Theatre Co. v. Hartlove,* 123 Md. 78; *Agricultural etc. Assn. v. Gray,* 118 Md. 600; *Carlin v. Krout,* 142 Md. 140.

So, where the mechanical contrivance was shown to have been constructed, maintained, and managed by the appellant and his agents, and the patron had paid the fare, and, after an assurance of its safety, but without any knowledge of its operation, had placed herself in the contrivance under the exclusive care and control of these agents, and while this relation continued, an accident occurred to her that, in the ordinary course of things, was such as does not happen—if those who have the construction, maintenance, or management use reasonable care and diligence, the occurrence of the accident was sufficient to carry the case to the jury for the determination of whether the accident arose from want

of reasonable care. *Benedick v. Potts*, 88 Md. 52; *American Express Co. v. Terry*, 126 Md. 261, and *infra*.

When the attendant pulled the lever and pushed down the latch so as to make the seat drop and the floor swing from under their feet, the appellee and her husband did not slip from the tilting seat to the top of the canvas belt as a careful operation of the machinery would have caused. Mrs. Smith's description is: "That after they were seated, the seat collapsed in some way, and they were shot out, she hurt herself, and they were shot out with force on this canvas." The witness said: "Oh, Jack, I have hurt my spine." She does not know whether she hurt her spine before she got on the canvas or after she got on the canvas, but it was just about the time she hit the canvas; that she does not know what kind of a blow it was—it was a terrific blow—it was enough to hurt her terribly. That she does not know what it was she struck. To the best of her recollection she was on the canvas when she was hurt. That it felt like a terribly sharp pain at the end of her spine. (The Court): What, if you know, was the cause of this terribly sharp pain? (The Witness): Well, it was something I struck during that operation.

The husband of the appellee testified that his wife's exclamation of pain was after the seat collapsed, but that it all happened so quickly he was unable to say whether her outcry was before she got to the canvass or afterwards.

The testimony of other members of the party, who followed the Smiths in quick succession down the device, tended to fix the place of the accident, and its cause, as being the negligence of the appellant in the operation, maintenance, or construction of the device.

For instance, Mrs. Ethel Fuller testified: "That a few seconds after they sat down on the bench it collapsed and threw them out on the canvas, and the canvas was very saggy and seemed to scoop over what felt like rollers. She was hurt as she passed over them, about two or three feet from where the seat collapsed. That she felt something very hard.

That it did not hurt her but she could feel it was a hard substance or a hard roller." Again, "That she received the sensation of the canvas belt being very loose. It had a scoop in it. She did not know how much, but it scooped down and then sort of went up over a roller apparently, and then scooped down and went up again."

Mrs. Thelma Mills stated: "That she hurt herself a little but did not get any serious injuries. It was right soon after the seat gave away that she hit against something. That she had gotten on the canvass when she was hurt." And Fred W. Mills, "recalls something sticking up that seemed higher and harder than the canvas somewhere between the centre and the top of the canvas; that you got a sensation of going over something when you went over the roller; that it was a sort of bump; that he only got that sensation at one roller; that this impression came at the first part of the slide, and that he had no feeling at all of going over anything when he went over the other rollers on the slide."

The amusement device was a complicated mechanism of many interdependent pieces. It was driven by a long endless canvas belt, which weighed six hundred pounds, and which was run by an electric motor. Its operation subjected the device to constant strain, stress and vibration, which was reflected in the continual loosening of nuts and bolts and which necessarily affected its other operative parts. An expert who had begun the construction of the device at the time of its installation, who had run the device, and who was employed to overhaul and repair it in July, 1923, stated, as a witness for the appellant, that the floor bolts or nuts had to be tightened every day, and that it was the duty of the attendants to go over them, and see that everything was in trim before starting the day's operation. The attendant in charge of the operation at the time of the accident did not make that kind of an inspection. He started the machinery, and while the device was operating, he listened to hear anything "click," and apparently depended on his ear and sight to discover if anything was loose or out of order. And he

did not tighten the bolts and nuts daily, because he had looked the device over while it was running and had listened, and did not believe the tightening was needed. While it did not take him more than five minutes to make his inspection, it required the expert, who had operated the device, six or seven hours of steady work to go over the device thoroughly and make some slight repairs. From this evidence the jury could have found that the force with which the appellee was propelled from the bench, or the slackness and sagging of the belt, or the striking of the appellee against a hard object, as a roller, was attributable to imperfect adjustment, alignment or a dangerous condition of the operative parts because of loosened nuts or bolts or other defects that had not been discovered and repaired by reason of this careless, cursory method of inspection. An inspection must be adequate, according to the circumstances, to be reasonably careful. If the jury had believed the testimony on the part of the appellee, it could have found that the violence with which the appellee was thrust from the seat drove her forward four or five feet with so much momentum that the slackened belt did not prevent her supine body from striking violently the second wooden roller, which fractured the end of her spine through the force of the impact.

If a party is a patron for hire of an amusement device, whose operation and nature are unknown, but which he has been assured are safe before he entrusts himself wholly to the care of the proprietor in the operation of the device, and an accident happens which is due to one of a number of causes, which all involve blame to the proprietor, he is not exonerated because the matter may be mixed in such confusion that the patron cannot accurately specify which of the possible causes of his injury is the actual one. The injury in the instant case arose from a defect in the device or in its operation when it was in use by the proprietor, and over which, and the agents employed in its operation, he had complete and exclusive control, which, if it had been exercised with a reasonable decree of care, could have forseen or discovered or avoided the defect in time to have prevented the

injury. It would be irrational to assume that in the usual and normal course of operation of this amusement device, when the patron was most dependent, a dangerous condition could prevail, without negligence on the part of the proprietor, where it could strike and injure the moving body of the patron, whose propulsion and movement were unforseen and under unknown conditions, but which were planned by the proprietor as a part of the patron's experience. 1 *Beven on Negligence* (3rd ed.), 125, 126; *Howser v. C. & P. R. R. Co.*, 80 Md. 146; *Benedick v. Potts*, 88 Md. 52, 55; *American Express Co. v. Terry*, 126 Md. 254, 261; *Heim v. Roberts*, 135 Md. 600; *Ches. & Pot. Telephone Co. v. Miller*, 144 Md. 645; *Goldman etc. Bottling Co. v. Sindell*, 140 Md. 488; *Winkelman & Brown v. Colladay*, 88 Md. 78, 91; *Decola v. Cowan*, 102 Md. 554, 555; *Ches. Iron Works v. Hochschild*, 119 Md. 309.

We do not find *Carlin v. Krout*, 142 Md. 140, to support the appellant's position. The record on that appeal does not present the question with which we are here concerned, but related "to visible conditions presenting known hazards which were voluntarily assumed," and to an accident which occurred through no defect in the amusement device nor negligence in its operation.

The nature of the accident, in this case, with its accompanying circumstances, was sufficient, if unexplained, to raise a presumption of negligence; and there was, also, independent evidence of lack of care on the part of the appellant. The lower court was, therefore, not in error in submitting the case to the jury. Nor should appellant's "E" prayer have been granted. This prayer was too general in its terms, and disregarded that portion of the testimony which, if believed, tended to establish that the device was in an unsafe condition by reason of insufficient inspection at the time of the accident. The remaining three exceptions are to the rejection of evidence, and in those rulings there was no reversible error, as the testimony excluded was irrelevant and immaterial.

*Judgment affirmed, with costs to the appellee.*

BOND, C. J., filed a dissenting opinion as follows:

It seems to me that the testimony tracing the injury to a bump on a roller in the contrivance on which the plaintiff was riding hardly rises above speculation. But passing that phase of the case, I think that while confining liability, according to the well-settled rule, to a failure to exercise reasonable care under the circumstances before the defendant, the court in effect holds him liable without requiring any such failure to be shown. We have a case in which the defendant has been held liable in heavy damages for an injury which, so far as any evidence shows, never occurred before, and has never occurred since, in thousands of tests, with the contrivance in the same condition. All the evidence on the point is to the effect that on the day of the injury to Mrs. Smith 522 people used the contrivance, some before and some after Mrs. Smith's ride, without any untoward occurrence; that during the same season 17,985 people used it, during the season before that 17,779 used it, and during the season before that 32,440 used it, all as it was on the day of the injury complained of, so far as known, and all without such complaint. There was evidence of one lady's having sprained an ankle in landing from it. Such a proportion of injury would seem likely to result from almost any activity, under the safest conditions imaginable. It would, as I see it, rebut the contention that the operator of the contrivance should, before the injury occurred, have acted in anticipation of it, and exercised care accordingly—that is, so long as the contrivance continued in order, and I find no actual evidence that it was in any respect out of order when the plaintiff rode on it. In the majority opinion, the possibility of disorder or disrepair, is, I think left to be inferred too far from the mere fact of accident; and then a failure to exercise reasonable care in preventing the disorder or disrepair so inferred likewise left to be inferred without sufficient basis in facts testified to. The experience of all those who rode before and after the plaintiff seems to me to negative any inference that the contrivance was out of order. The mere

fact of accident on the premises or appliances of the defend-
ant is not, of course, sufficient to charge the defendant with
liability. *Washington etc. Turnpike Co. v. Case,* 80 Md.
36, 45; *Arnold v. Green,* 95 Md. 217; *Pillard v. Ches. Steam.
Co.,* 124 Md. 468, 474; *Callis v. United Railways,* 128 Md.
406, 411; *Coughlin v. Blaul,* 120 Md. 28, 35; *Carlin v.
Krout,* 142 Md. 140.

In the case of *Godfrey v. Connecticut Co.,* 98 Conn. 63,
the court had to consider an injury on a contrivance which
appears to have been similar to the one now under consid-
eration, except that in that contrivance there was no canvas
belt running over the rollers. "In the operation of the con-
trivance," said the court, "when the seat is tipped forward
by pulling the lever, its occupants slide off from the seat and
on to the top roller in the chute, and thence downward over
the other rollers successively, with a bump between each two,
until they roll over the lowest and arrive with a final bump
upon the ground floor near the exit from the building." And
in discussing the question of liability the court said: "More
than sixty constructions of this kind are in use in amuse-
ment resorts in the United States. In the year 1920, more
than 11,000 persons patronized the one complained of, and
more than 15,000 a similar one in Hartford. No complaint
was made by anyone except the plaintiff. * * * The mere
possibility of injury through some cause or condition not
reasonably likely to occur, does not justify the classification
of an instrument as inherently dangerous in itself or in its
operation. * * * The single instance of the accident to the
plaintiff, even if it be admitted that it happened as he claims
it did, does not reveal the existence of any danger in the use
of the contrivance which should have been reasonably antici-
pated. It would not justify the conclusion that reasonable
care had not been previously exercised, when balanced
against the unquestioned evidence that more than 25,000
persons have used this appliance and another like it without
a single complaint of injury. Moreover, in view of such
experience in the operation of this device, it could not be

found reasonably that there was any fault or danger in the apparatus itself, or in its customary and careful use, which the defendants knew or, in the exercise of the care imposed upon them, should have known. From examination of the whole record, it is evident that in this case there is no evidence to show 'the dangerous construction' of this device, or its 'negligent operation,' or that it was out of order or repair, or that the premises on which it is located are not reasonably safe for visitors, or to reveal any fact which tends to prove that this contrivance, while in operation, should reasonably be expected to inflict injury upon any person. Therefore the defendant, the Otisco Amusement Company, which had the immediate care and supervision of the premises and apparatus, did not fail in any respect to exercise the care which the law required in the circumstances."

In *Fenner v. Atlantic Amusement Co.*, 84 N. J. L. 691, the plaintiff's heel had been caught in a roller on a similar contrivance, and she had been twisted around, thrown forward head foremost, and bumped over every roller; but the court found no ground of liability in the proprietor.

In *Denver Park & Amusement Co. v. Pflug*, 2 Fed. (2d) 961, a woman riding on a moving belt broke her leg. There was evidence given that 60,000 persons, including children, had used the contrivance during the same season, without injury. The Court (Circuit Court of Appeals, 8th Circuit) said: "No such thing had ever happened before. Past history and experience would not have suggested to prudent men that it would happen, but on the contrary that experience, if suggestive at all, would be indicative that it would not and could not happen, and the defendant was not under a duty to guard against what did happen."

In *Hubbell v. Yonkers*, 104 N. Y. 434, Peckham, J., said: "That which never happened before, and which in its character is such as not to naturally occur to prudent men to guard against its happening at all, cannot, when in the course of years it does happen, furnish good ground for a charge of negligence in not foreseeing its possible happening and guard-

ing against that remote contingency." And see *Dallas v. Maxwell* (Tex.), 27 A. L. R. 927, and note 29 A. L. R. 13, 29.

Upon these principles, my conclusion has been that the judgment in the present case should be reversed.