# WILLIAM P. LAWSON *v.* ISAIAH D. CLAWSON

## [No. 42, October Term, 1939.]

334

*Decided November 29th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Robert D. Bartlett* and *C. Damer McKenrick,* for the appellants.

*Walter L. Clark* and *Roszel C. Thomsen,* with whom was *J. Gilbert Prendergast* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

On the evening of October 4th, 1937, Isaiah D. Clawson, the appellee, attended an all-star professional wrestling match at the Fifth Regiment Armory in Baltimore, having previously purchased tickets to entitle him to witness that contest. With a companion, he arrived at the armory early, presented his tickets and upon being admitted took a seat on the fourth or fifth row from the bottom of the bleachers. That particular section in

which he sat had an estimated capacity of three hundred spectators and was then less than half filled. Suddenly there was a sound of breaking timbers, and the entire section seemed to sway and move slightly forward, before completely collapsing and throwing him violently to the floor. Prior thereto appellee had done nothing except occupy his seat, and the spectators were quiet, except for movements incidental to taking seats. There had been no applause, hand-clapping or stamping of feet, and no commotion or activity of an unusual nature. As a result of his fall, Clawson sustained serious and painful injuries, especially in the lower region of his back, was confined in a hospital for two weeks, and subsequent to his discharge therefrom was fitted with a special back brace which he has since worn. Specifically, his back injury was to his left sacro-iliac joint, and, according to the proof, he will be compelled to wear a support the remainder of his life, and will suffer pain in the injured region whenever he tries to lift or use his back to any great extent.

Contending that the connection of Willian P. Lawson, Thomas J. Mooney, International Association of Police Chiefs Convention Committee, a voluntary unincorporated association, Edward A. Contos, Inc., and Baltimore Police Beneficial Association, also a voluntary unincorporated association, with the all-star wrestling match was such as to impose liability from them to him, Clawson brought suit and recovered a judgment against all of them, except the Baltimore Police Beneficial Association, as to which he suffered a *non pros.* at the close of the entire case, and the present appeal is taken by all parties against whom judgment was recovered, except Edward A. Contos, Inc.

During the trial five exceptions were reserved by appellants to the rulings of the trial court. Four of these relate to rulings upon evidence, while the fifth has reference to the prayers.

The circumstances under which appellee's injuries were sustained, as well as the character of those injuries,

have been sufficiently detailed, but in order to deal with the exceptions to which reference has been made, it is necessary to state the part taken by each of appellants in producing the wrestling match at which Clawson was injured.

The wrestling bout was being given as a part of the entertainment for the visiting delegates attending a convention of the International Association of Chiefs of Police then being held in Baltimore City. William P. Lawson, the then Police Commissioner of Baltimore City, was member of the association, and, in order to make advance arrangements for activities of the convention, called a meeting of the inspectors and captains of the city's police department, at which the decision to stage the professional wrestling match was agreed upon. Lawson thereupon appointed a committee for that purpose, and designated as its chairman Inspector Thomas J. Mooney. Lawson was chairman of the executive committee which handled the affairs of the convention, and also served as chairman of the finance committee, and in the capacity last designated signed all checks for disbursements of funds. Those checks were drawn on a special account opened in the name of the "Finance Committee I. A. C. P. Convention," and all money received from the sale of tickets for the wrestling match was turned over to "The International Association of Chiefs of Police Convention Committee," and deposited in a special account. As chairman he also received an accounting of the profits and expenses of the wrestling match, and the sale of tickets therefor was conducted through his office. As "Police Commissioner" he signed the contract for rental of the armory, but the convention committee made the contract to stage the wrestling match with Edward A. Contos, Inc. By the terms of that agreement Contos, Inc., was to receive a percentage of the gross receipts from ticket sales, in addition to a portion of the funds realized from concession sales.

Mooney, as chairman of the wrestling committee, negotiated for the rental of the armory, and later re-

ported to Lawson and to the captains and inspectors of the force that it had been made ready. He also made arrangements with Contos, Inc., concerning the details of the show, was in charge of the sale of all tickets, and received an accounting of the receipts and expenditures incident to the wrestling match. However, he soon realized that difficulty would be encountered in securing stadium seats or bleachers to accommodate the crowd expected at the wrestling show, but, under the agreement between Contos, Inc., and the convention committee, the former was to stage the show, and Edward A. Contos, individually, contracted with the Washington Bleacher Seat Company to place from forty-eight to fifty-two sections of fifteen row bleachers in the armory, the exact number depending upon where the fire marshal designated the aisles. By its terms Contos was to furnish all necessary labor, with the exception of two foremen to be supplied by the Bleacher Seat Company.

The erection of the bleacher stands was begun on the Friday preceding the bout, that was to take place on Monday. The workmen who erected the stands, under the supervision of the foreman supplied by the Washington Bleacher Seat Company, were members of the Fifth Regiment, then unemployed, and secured for the immediate task. They were hired as unskilled laborers, although a few of them may have been carpenters, and their employment came about as a result of an inquiry made by Contos to Captain Terry, an officer of the Maryland National Guard, stationed at the armory. On Sunday afternoon the work had been completed, but at no time were any tests as to the strength or security of the bleacher stands made by Lawson, Mooney, or any other member of the committee. The only thing approaching an inspection was made by Dorsey, the foreman and employee of the Washington Bleacher Seat Company, upon the request of Captain Terry, and that inspection, if indeed it may be termed an inspection, consisted in going under the stands with three or four men, plus the use by Dorsey of six or seven pro-

gram boys to jump upon the stands and run up and down the rows of seats. The collapse of the section was due to the breaking in their centers of three or four risers which held the entire section. Dorsey, the Bleacher Seat representative, did not testify, and there is no evidence that such inspection as was made by him included an inspection of the risers, which were two by ten inches, with their forward ends resting upon the armory floor and of sufficient length to accommodate fifteen rows of seats, the opposite ends of the risers being about ten feet in height. They were spaced about four feet apart and secured by a stirrup type strap at the bottom. It was shown that a brace settled on some of the jacks which sprang out of the stirrup, causing the entire section to move forward, with the result that the weight of the section was thrown upon the center of the risers. The record is devoid of evidence showing or tending to show that the collapse of the section was occasioned by a latent defect in construction or materials, and sufficient has been said to justify the conclusion that a proper inspection would have revealed the insecurity of the stirrups that were designed to hold the risers.

Clawson purchased his tickets after being solicited by the defendants, who fully realized that large numbers of people were expected to witness the wrestling bout, also that bleacher seats would be required for their accommodation. That being true, the minimum degree of care on the part of the convention committee to him was to provide him a reasonably safe place to sit in order to witness the contest. The convention committee, under Code, art. 23, sec. 104, as amended by chapter 504, Acts of 1937, is suable to the same extent as a body corporate, and having offered no explanation to exculpate it from liability, it must follow that the evidence referred to was sufficient to justify an inference of negligence on its part, for, as said in *Albert v. State, use of Ryan,* 66 Md. 325, 337, 7 A. 697, 700, "he who solicits and invites the public to his resorts must have them in a reasonable safe condition, and not in a condition to risk the lives and limbs

of his visitors." See also *Harford Agricultural & Breeders' Assn. v. Brown*, 166 Md. 262, 170 A. 782; *New Theatre Co. v. Hartlove*, 123 Md. 78, 90 A. 990; *Carlin v. Smith*, 148 Md. 524, 130 A. 340; *Pindell v. Rubenstein*, 139 Md. 567, 115 A. 859; *United Rwys. & Electric Co. v. Dean*, 117 Md. 686, 84 A. 75; *Agricultural & Mechanical Assn. v. Gray*, 118 Md. 600, 606, 85 A. 291; *Frenkil v. Johnson*, 175 Md. 592, 3 A. 2nd 479; and annotations 22 *A. L. R.* 619.

The view has been advanced and urged by appellants that appellee's allegations of specific negligence preclude an inference of negligence under the circumstances detailed, and that therefore no *prima facie* case has been made out. In support of that contention we are referred to three federal decisions appearing in 79 *A. L. R.*, pages 61 to 71. We are not prepared to follow the rule contended for in view of the following decisions of this court, in all of which the doctrine of *res ipsa loquitur* was applied, notwithstanding there were in each case specific allegations of negligence: *Howser v. Cumberland, & P. R. Co.*, 80 Md. 146, 30 A. 906; *Pindell v. Rubenstein, supra; Chesapeake Iron Works v. Hochschild Kohn & Co.*, 119 Md. 303, 86 A. 345; *Chesapeake & P. Telephone Co. v. Miller*, 144 Md. 645, 125 A. 436; *State v. Emerson & Morgan Coal Co.*, 150 Md. 429, 133 A. 601; *Baltimore American Underwriters v. Beckley*, 173 Md. 202, 195, A. 550.

A further question presented by the prayers involves a consideration of whether by virtue of the active connection of Lawson and Mooney in arranging and procuring the wrestling match, soliciting patrons and selling tickets, they incurred an individual responsibility to Clawson, in addition to that of membership upon the convention committee or unincorporated association.

In *Cooley on Torts* (3rd Ed.), at page 213, it is stated: "When several participate, they may do so in different ways, at different times, and in very unequal proportions. One may plan, another may procure the men to execute, others may be the actual instruments in accomplishing

the mischief, but the legal blame will rest upon all as joint actors."

It would seem that Mooney and Lawson, in advertising and making arrangements for the match, selling the tickets, leasing the armory, and having it fitted up to take care of the spectators, were acting individually and collectively; that they impliedly represented that due care had been used and the seats were reasonably fit for the purposes designed. If Lawson and Mooney would have been liable individually had the convention committee been a body corporate, it is difficult to see why in the present instance they would be excluded from personal liability, inasmuch as the committee occupies, for the purposes of this suit, under the provisions of the statute, a status similar to that of a corporation. The nearest decision in point to which we are referred is that of *Scott v. University of Michigan Athletic Assn.*, 152 Mich. 684, 116 N. W. 624. There the action was brought by a paying spectator injured in attending a football game when a part of the bleacher seats collapsed. The Supreme Court of Michigan held it proper to submit the case to a jury not only against the athletic association, but also against one Baird, who was the graduate director of athletics employed by the board of regents, and was also one of the directors of the athletic association and a member of its finance committee. See also *Hartman v. Tennessee Fair Assn.*, 134 Tenn. 149, 183 S. W. 733. Upon the reasoning of those authorities it must be held that in view of the connection of Lawson and Mooney with the wrestling match, and their activities in respect thereto, the case was properly submitted to the jury as to them.

A further contention is made by appellants that they are not liable in this action, because the stands or bleachers were erected by an independant contractor, but their prayers numbered A-4-6 and 9 asserting this as a defense were refused. No error is found in those rulings. *Smith v. Benick*, 87 Md. 610, 41 A. 56; *Agricultural & Mechanical Assn. v. Gray, supra.*

Each of appellants offered prayers B-1-2 and 3, seeking

an instructed verdict upon the ground of failure of any legally sufficient evidence to show negligence justifying a recovery. Since the three last mentioned prayers made reference to the pleadings without, however, pointing out any variance, as required by Code, art. 5, sec. 11, they cannot be considered as proper variance instructions but are to be treated as demurrers to the evidence. *Roycroft v. Nellis,* 171 Md. 136, 188 A. 20; *Weiss v. Dredge & Dock Co.,* 155 Md. 351, 142 A. 253, and *Washington Railway & Elec. Co. v. Anderson,* 168 Md. 224, 177 A. 282. If the evidence was sufficient to require submitting the case to the jury against all of appellants, those instructions were properly refused, and since we have already decided that question in the affirmative, it follows that no error was committed in their refusal.

By Lawson's seventh and Mooney's eighth prayers, instructions were sought by each of them that the mere happening of an accident raised no presumption of negligence upon their part, and the burden of proof rested upon the plaintiff to show by a clear preponderance of affirmative evidence that appellee's injuries were the direct result of negligence on their respective parts, and if the minds of the jurors were left in a state of even balance as to their negligence, the verdict must be in their favor. Their refusal was proper, inasmuch as appellee was injured under circumstances justifying an inference that his injuries would not have occurred had those persons in charge of the seating arrangements for the wrestling bout exercised ordinary care; moreover, since negligence could be presumed as a rational inference from the facts before the jurors, the instructions as offered were calculated to mislead rather than help them. *Pindell v. Rubenstein, supra; State v. Emerson & Morgan Coal Co., supra.*

Appellants' fifth prayer, which was granted, instructed the jury that they (appellants) were not the insurers of plaintiff's safety, but obliged only to exercise a reasonable degree of care in safeguarding him from injury, and defined reasonable care as that degree of care which ordinary careful and prudent persons would use under simi-

lar circumstances, and concluded with the statement that if the jurors found appellants did use such degree of care in staging or causing the wrestling bout to be staged, then the verdict of the jury must be in favor of the defendants. In our opinion that instruction was proper and presented appellants' case to the jury in as favorable light as they could ask.

By appellee's granted prayer, the jurors were required (a) to find that appellants invited him to attend the wrestling match, (b) that they charged him a cash admission fee thereto, and finding such facts asserted that it was appellants' duty to use ordinary care in seeing that the premises where the show was held and all appliances and bleacher seats there located were in reasonably safe condition for appellee, a paying spectator, and instructed the jurors that if they found appellants failed to exercise ordinary care in seeing that the bleacher seats were in a reasonably safe condition and finding further that such seats were unsafe and dangerous, that their condition caused them to collapse and the plaintiff was injured by reason of such collapse, then their verdict should be for the appellee as against appellants, regardless of whether they themselves erected the bleacher seats, unless they further found that appellee contributed to his own injury by failing to exercise that degree of care for his own safety which prudent persons ordinarily exercised under similar circumstances. No criticism is made of that instruction, except that part of it which we have considered with reference to the contention that appellants are not liable because the bleacher seats were erected by an independent contractor. Having decided that, in view of the nature of the case and the facts and circumstances surrounding it, the defense that the seats were erected by the Washington Bleacher Seat Company and not by appellants is not tenable, the prayer, in our judgment, correctly instructed the jurors as to the law, and was properly granted.

The first exception was reserved when the trial court overruled an objection by the defendants' counsel to a question propounded Commissioner Lawson, as to whether

he had designated any one connected with the Chiefs of Police Association, or the Baltimore City Police Department, or the Police Beneficial Association, to make an examination of the seating arrangements in the armory to ascertain whether they were safe before spectators were admitted. A similar question was asked of Inspector Mooney, and in each case the witnesses gave negative answers. No reason is assigned in suport of those objections, and it seems they could have been sustained only on the theory that Mooney and Lawson were under no obligation to ascertain whether the premises were safe for spectators who attended the wrestling match. On each occasion the trial court restricted the answers to the defendants being interrogated, and those rulings are free from objection.

The fourth exception was taken after appellants' counsel made a proffer of proof that the Washington Bleacher Seat Company had been in business for many years, had supplied seats for certain designated public exhibitions attended by large crowds, and was the only organization in that area equipped with facilities to supply and erect the bleacher seats of the capacity required in the performance on October 4th, 1937, and the trial court sustained an objection on the ground, (a) that no attack on the competency of the bleacher seat company had been made; (b) because the evidence showed that, except for not more than two superintendents, all work was done by labor furnished by Captain Terry of the Fifth Regiment and a member of the convention committee. Those reasons are sufficient to support the ruling forming the subject of the third and fourth exceptions, if it be assumed that the third is properly before us. It might be added that appellants' duty to use ordinary care could not, under the circumstances considered, be delegated, and the facts included in the proffer were therefore irrelevant.

Finding no error in the rulings complained of, the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*