Joe Borough, Appellant, v. Minneapolis & St. Louis Railway Company, Appellee.

RAILROADS: Accidents at Crossings—Negligence—Jury Question.
1  Evidence attending an accident at a crossing reviewed, and held to present a jury question on the issue (a) of defendant's negligence, and (b) of plaintiff's contributory negligence.

WITNESSES: Impeachment—Contradictory Statements. Statements by a witness out of court contradictory of his statements in court do not constitute substantive evidence of the matter in issue.

*Appeal from Keokuk District Court.*—John F. Talbott,
Judge.

April 4, 1918.

Rehearing Denied September 20, 1918.

Action to recover damages for personal injury. Opin-
ion states the facts. The district court directed a verdict
for the defendant. Plaintiff appeals.—*Reversed and re-
manded.*

*C. C. Orvis, Hamilton & Beatty,* and *Talley & Snaken-
berg,* for appellant.

*Burrell & Devitt* and *Stockman & Baker,* for appellee.

Gaynor, J.—This action is brought by the plaintiff to
recover damages for personal injuries alleged to have been
caused by the negligence of the defendant in operating one
of its trains over a public crossing. The
cause was tried to a jury, and, at the con-
clusion of all the evidence, the court in-
structed the jury to return a verdict for the
defendant. The verdict was accordingly returned, and,
judgment being entered upon the verdict, plaintiff appeals.

1. Railroads :
   accidents at
   crossings : neg-
   ligence : jury
   question.

It appears that the track on which the collision oc-
curred, crosses a public highway, at the point of the in-
jury, and runs east and west. North of this track is what
is called the passing track. The plaintiff was driving
north. The record shows that the distance from the south
rail of the south track to the south line of the right of way
fence is approximately 22 feet and 6 inches, and the dis-
tance between the south rail of the north track and north
rail of the south track is approximately 11 feet. The rails
are about 4 feet, 8½ inches apart. This would make it
about 38 feet from the south rail of the north or passing
track to the fence on the south line of the right of way.

At the time plaintiff approached this crossing, there was a freight train standing on the north or passing track. This train had been cut in two, or divided, so as to permit passage over the highway between the parted portions of this train. The train that struck plaintiff came from the east, was a passenger train, and was running about 30 miles an hour. The plaintiff, with two companions, was riding in a buggy, drawn by a single horse. The evidence tends to show that, as the plaintiff and his companions came upon the right of way from the south, and had passed certain obstructions in the way of hedges, cornfields, and telegraph poles along the south line of the right of way, the horse was stopped, and they looked to the east, and saw no train approaching from the east, and heard no whistle or sound of warning given of the approach of a train from that direction; that both tracks were clear, at that time, for passage; that plaintiff and his companions then discussed the propriety of attempting to pass between the divided freight train, and, some doubt having been expressed in the discussion as to whether this freight train was going to close up the passage or not, they reached a conclusion that they could pass between this divided freight train in safety. They then proceeded northward on their journey, without seeing or hearing anything to indicate a train approaching from the east, although they looked and listened, while so proceeding. Just as they reached the track on the south or main line, and just as the horse was passing upon that track, the testimony tends to show, the crew in charge of the freight train on the passing track suddenly closed the passage to the north; and they thereupon, for the first time, discovered a train approaching rapidly from the east. One of the parties in the buggy jumped, in time to escape. The plaintiff was seriously injured by the collision, and one of his companions was killed.

It appears that the main track east of this highway runs

directly east, about 180 feet, and at that point curves, close
to 30 degrees, to the northeast. There is a highway 1,800
feet east of the highway where the accident occurred. That
highway runs east and west, and the railway track crosses it
at right angles. There is another highway, 2,600 feet east
of this highway, running directly north and south, and
there the railway track crosses the highway at right angles,
running directly east. The north or passing track turns on-
to the main line at a point about 700 feet east of the cen-
ter of the crossing on which the accident occurred. Thus
it appears that, 1,800 feet east of the highway where the
accident occurred, the main line track is running practi-
cally north, and 2,600 feet east, it turns to the east, and
runs practically due east.

There is some confusion in the testimony as to just
where the engine on the freight train was standing, at the
time plaintiff and his companions entered the right of
way. It is claimed by the plaintiff—and evidence is in the
record to support it—that the freight engine was emitting
smoke in large volumes; that this smoke came down over the
highway; that it obscured their view to the east to a con-
siderable extent; that they listened for the whistle and
bell, but heard none; that their minds were occupied, to
some extent, as they approached this opening between the
freight cars, to ascertain whether they could pass through
there with safety; that, as they approached, the freight
train was standing still, but, as they got up to or onto the
main track, the train suddenly backed up, and closed the
passage; that one of the companions jumped out, and the
other cried to the driver to turn the horse around [it will
be noted that there is only eleven feet between the two
tracks. Undoubtedly, the cars extended considerably over
this, making the opening between much less]; that they
were in the act of extricating themselves, when someone
cried, "The passenger train is coming." One jumped out,.

and one was killed, and plaintiff was injured by the collision.

Under this state of facts, we think that the negligence of the defendant and want of contributory negligence on the part of the plaintiff were questions for the jury.

2. WITNESSES: impeachment: contradictory statements.    There is evidence in the record from other parties not interested in this suit, that the whistle did blow, not only for the crossing at which the injury occurred, but at the road crossing east; and there is evidence that the bell rang continuously, and was ringing continuously prior to and at the time of the accident.

On the night of the accident, an inquest was had over the body of the dead person. Northrup, who escaped by jumping from the buggy, was a witness, and gave a strangely different account of the conditions there from that given by him on this trial. From that testimony, and from statements made by him immediately after the accident, it would seem that the parties had discovered the approaching train before attempting to cross, and that the discussion referred to on this trial related to their ability to cross ahead of the approaching train, and get through the opening before the freight train should close. The claim of this witness now is that he does not remember what was said at that time; that he was greatly confused. But however that may be, the credibility of the witnesses is for the jury, and not for the court. Northrup also signed a statement, soon after the injury, in which he said:

"When we approached the crossing, the horse was trotting. I noticed the train coming when we were about 20 feet from the main line track, and called the attention of the other boys to it; but they both said they thought they could make it across. I saw the headlight, and also heard the rumble of the train. Train on the siding was standing still, and the crossing was cut, and it didn't move while I

was in the buggy. I got out just before the mare stopped
on the track. I did not notice that the driver tried to check
the horse up at all."

In another signed statement, he said:

"We saw a freight train standing on the track, with
the train cut for the crossing. I heard the passenger train
coming, and I said, 'I don't believe we can make it,' and the
others both said they thought they could. I did not realize
the train was so close. When the mare was on the track,
I first realized that the passenger was close. I then jumped
out, and saved myself. I saw the headlight on the engine,
but didn't hear the bell rung. Didn't hear the whistle
blow. However, I heard the train coming."

This, of course, was not substantive evidence, and could
only be used for the purpose of impeaching the witness.
He was not a party to the suit. It was competent, how-
ever, for that purpose, and that purpose only. It was for
the jury to say, in the light of all the facts and circum-
stances disclosed on the trial, what credit should be given
to this testimony,—to say at which time he told the truth.
He was the only living witness to the accident except the
plaintiff, and the only one who was in a position to say just
what they were doing prior to the collision. The jury might
well have disregarded his testimony altogether, except in so
far as it was corroborated by other unimpeachable evidence
in the cause. But this court does not sit in judgment upon
the credibility of the witnesses. Both statements of this
witness cannot be true. If he has deliberately falsified in
one instance, it is quite impossible to tell from his testimony
what the fact really is.

There would be no profit in setting out all the testi-
mony; but there was positive testimony to the effect that,
after they got on the right of way, and passed the obstruc-
tions, they stopped, looked, and listened; that, as they drove
up to the track where the injury occurred, they were still

listening; that the smoke from the engine on the sidetrack tended to obscure the view to the east; that there was no one stationed at the opening between the two parts of the freight train; that, when the freight crew saw the passenger train approaching, they immediately backed up, and closed the opening in the highway. There is evidence that they gave no warning to travelers upon the highway that this movement was contemplated, or that it would take place. It is also claimed by plaintiff that, before the engine was moved to close the gap, the engine stood so near the main line that it obscured the vision to the northeast. These were all questions for the jury.

The testimony of plaintiff is that, when he passed the obstructions south of the right of way, he stopped the horse and looked; saw no train approaching; that a discussion then arose as to whether or not the train on the passing track would close before they had time to pass through; that this discussion resulted in a conclusion that they could do so safely; that they then proceeded on their journey. It is claimed that they were still listening. The plaintiff testified:

"I didn't hear nor see any train except the freight on the right of way at that time, nor did I hear any warning signal or bell or whistle on the passenger train, nor any light from an engine coming on the right of way. We drove right on; and, immediately after we got on the main track, and before we got through, the freight train closed up, and of course we couldn't get through. As we approached, the freight train was standing there, headed to the east, just as it had been cut for people to go through. The engine was east of the highway, and the coal and one or two other cars, and the rest of the train and cars were west of the crossing. The opening was 10 to 12 feet, sufficient to drive through. I think, besides the tender, there were three cars attached to the engine, extending 50 to 75

feet east of the highway.   Near the end of the hedge on the
south side of the right of way, we stopped plumb still, and
talked in regard to whether the train was going to close
up.   It was letting off steam, and we stopped and talked
the matter over.   We did not think it was going to shut
up, because they nearly always have somebody there.   [This
last answer was, however, stricken out.]   When I looked
east, there was smoke and steam from the engine blowing
off onto the right of way.   I was on the track when I first
saw the passenger train, and I told the driver to turn the
mare around.   The opening in front of us was closed.   It
was all done so quick.   The wind was blowing from the
north, and was blowing south at the time they closed the
freight train. * * * The freight train engine obstructed the
view of the main line.   There is a curve there, and the main
line swung around the freight engine so as to prevent me
from seeing the coming train.   From the public highway,
after you pass the hedge fence, it is 20 feet before you
reach the south rail of the main line.   We stopped and
looked for the train after we passed the hedge.   We could
see a train if one were coming.   We were 20 feet south of
the railroad when we stopped to look, and we could have
seen the approaching train, had it not been for the freight
engine.   The first I knew of the passenger train's approach
was when we were up on the main track.   If it had not
been for the smoke and steam, we could have seen the train.
The accident occurred about 10 o'clock at night."

Northrup, one of the parties, testified on this trial:

"I had not observed the passenger train until we were
about to drive on the track.   Just then, the freight train
jammed together.   We kept looking for trains and listening
for trains.   I heard no train on the right of way that night.
There was smoke coming from the freight engine that ob-
structed the view to the east.   When I saw the train, I
jumped out.   The horse was trotting at the time I jumped

out of the buggy, just before we reached the main line. There was steam and smoke from the freight engine settling down upon the main track, and that prevented us, on looking east, from seeing the approaching passenger train. No bell or whistle or warning was given of the approach of the passenger train."

In setting out the testimony, we have only appropriated that which is most favorable to the plaintiff's claim. This we must do, since the court did not permit the jury to pass upon it. Plaintiff is entitled to have the testimony of his witnesses accepted as true by this court, for the purposes of this hearing; and we cannot say, as a matter of law, that this record does not disclose negligence on the part of the defendant and want of contributory negligence on the part of the plaintiff. It was for the jury to say what credit it would give to the plaintiff's evidence, in view of the contradictory statements made by the witnesses, both on the question of the defendant's negligence and on the question of want of contributory negligence. There was evidence that the bell was not rung; that the whistle was not blown. There was evidence that the train could not be seen, because of conditions there at the time plaintiff was approaching. There is evidence that plaintiff stopped, looked, and listened. We cannot say, as a matter of law, that there was not negligence shown on the part of the defendant sufficient to take the case to the jury. It was for the jury to weigh the evidence. It was in sharp conflict. We think the court erred in instructing the jury for the defendant.

We have so frequently discussed questions of this kind that we do not deem it necessary to set out the authorities on which our conclusions are based. Our books are full of cases involving substantially the same questions here

submitted; and, for the reason aforesaid, the case must be and is—*Reversed and remanded.*

PRESTON, C. J., LADD and STEVENS, JJ., concur.