## HARFORD AGRICULTURAL AND BREEDERS' ASSOCIATION *v.* THOMAS J. BROWN.

[No. 88, October Term, 1933.]

*Decided February 1st, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*J. Kemp Bartlett, Jr.,* with whom was *Robert D. Bartlett* on the brief, for the appellant.

*Frederick Lee Coburn,* with whom was *A. Freeborn Brown Brown* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered by the appellee, Thomas J. Brown, against the appellant, the Harford Agricultural & Breeders' Association, Inc., for alleged injuries to the appellee caused on September 27th, 1932, by being struck and knocked down by an automobile driven by one Harold R. Dickey, while upon the appellant's fair ground or premises.

The declaration alleges that upon the date mentioned, September 27th, 1932, the defendant was the owner of, and was in possession and control of, the ground and premises upon which it conducted and operated a race track "whereon running races for horses" were held, and where the general public was invited to attend the races; that on the date mentioned the plaintiff attended the races on the implied invitation of the defendant; that a place of entrance and exit for its patrons to its track was provided by the defendant, to the right of which, upon the defendant's premises, there is what is known as the clubhouse inclosure, in which, under certain conditions, owners were permitted to park their automobiles; that to the west or southwest of the defendant's property, and running parallel therewith, there is a state concrete road for the use of automobiles, and the defendant, for the use of its patrons, provided a cement walk or footway leading therefrom to the general entrance to the race track, which footway

is used exclusively for pedestrian travel and "lies contiguous to the club house enclosure and is separated therefrom by a high, substantial iron fence; that a gate in said iron fence is usually kept closed and locked, but at the conclusion of races each day the gate is unlocked by the defendant, and automobiles parked within the club house enclosure are invited and permitted * * * to cross the said paved footway at right angles; that the plaintiff being upon the premises of the defendant upon its implied invitation, it was the duty of the defendant to use all reasonable care to protect the plaintiff from injury. In disregard of its duty, while the plaintiff * * * using all proper care and caution was leaving the grounds of the defendant, and was walking along and across the paved footway * * * the defendant negligently and carelessly permitted and invited an automobile being then and there operated by one H. R. Dickey to leave the club house enclosure * * * and to cross the paved footway provided for pedestrians whereon this plaintiff was then and there walking, and said automobile struck the plaintiff in the back, knocked him down, severely, painfully and permanently injuring him * * * causing him to spend large sums for medical treatment and nursing. * * * That the injuries sustained by him * * * were wholly due to the negligence and want of due care on the part of the defendant, its servants, agents and employees, and without any negligence or want of due care on the part of the plaintiff thereto contributing."

The case was tried by a jury, and at the conclusion of the plaintiff's evidence the defendant offered a prayer, which was refused, asking the court to take the case from the jury because of a lack of legally sufficient evidence. At the conclusion of the entire evidence, the prayer was again offered and refused, and judgment was rendered for the plaintiff. It is from that judgment that the appeal in this case was taken.

To determine the correctness of the court's ruling upon this prayer, it is necessary that we state quite fully the evidence in this case.

James P. Ross, the defendant's manager of the Havre de Grace race track, when called by the plaintiff, explained a drawing of the entrance to the race track and the approaches thereto, and pointed out thereon the state road leading to such entrance and the parking space to the west of the road, where automobiles other than those privileged to use the club house inclosure were parked. He also pointed out the main entrance to the race track, the club house inclosure to the right of the footway to the entrance, and the guard posts along the state road in front of the entrance, which were erected to keep automobiles from making short turns in going down the walk to the road.

This witness testified that the club house inclosure was covered with stone screening and used as a parking place for guests having club house privileges, and was supervised by an employee of the defendant association; that, after the races were over, the cars in the inclosure go out through the gate in the iron fence which separates the inclosure from the footway, and cross the footway at right angles to get to the cinder roads that lead to the highway at a point beyond the guard posts; that Pinkerton men "are employed by the company (the defendant) and are in charge of the gates, and he does not think a police officer is at the gate when it is open"; that an employee of the association opens the gate after the races in the club house parking space; and that this gate is the only one used as an exit from the club house area.

Upon cross-examination, the witness stated that the concrete area was only reserved for pedestrians while the races were in progress and not after the races were over; and that for the last six or seven years, after the races were over, pedestrians leave by the main entrance as indicated and automobiles from the club house area by the gate indicated; that the first notice he had of this accident was when Mr. Fahey, the president (of the defendant company), notified him the day the papers were served on him, which was February 11th; that no one had ever made any claim or demand on the race track before this suit was filed.

Thomas J. Brown, the plaintiff, who was seventy-four

years of age, testified: That he "had lived in Perryville, Cecil County, for the last six years and prior to that in Havre de Grace for eight years, and had lived next to the race track for a great many years, thirteen to be exact, and prior to that at Swan Creek, a mile and a half from Havre de Grace, all his life." That he was at the Havre de Grace race track on September 26th, 1932; he rode out with a stranger, who parked his car on the James property on the west side of the state highway. He crossed the state highway and entered the race track by going through the main entrance heretofore described. He remained at the races until they were over, and then left for home. "He travelled practically the same way as he went in, * * * and before he got to this gate, he looked to see if there were any automobiles. He didn't see any and started out; he didn't see anything at all. He was hit, and didn't remember anything more until he was in the hospital." That he was at the time walking on the concrete footway which led out to the state road, and that at the time he was struck he was in line with the gate leading from the parking inclosure; that he was walking diagonally across the concrete area heading for the posts next to the public highway, so that he might cross the road to the place where the car in which he had come was parked. He could not tell "what part of his body was struck as it happened so quick, but he was not struck in the face; he imagined it was around about the hips on the left side; but he does not remember anything and did not regain consciousness until he was at the hospital at Havre de Grace."

On cross-examination he testified that he had "been going regularly to the races at Havre de Grace ever since the track was built"; that the condition * * * has existed right along but had been improved"; that just before he was struck, he looked and didn't see any automobiles coming, which was just before he got to the gate leading out of the parking space. * * * That the parking space was not alive with automobiles at the time; that there was not a solid line of cars coming out of this space; that when he was on the concrete space just before he got in line with the gate, he looked

to the left to see if any automobiles were coming, because that was the only way from which cars would come, that he didn't see anything; that the space was level but it was too dark to see two or three hundred yards, but he could see fifty yards, but would not say that distance was accurate. That he didn't see any automobiles at all either in the parking spaces or coming out. That he has no recollection of walking along a line of cars that were sometimes stopping and sometimes moving very slowly, as there were not any cars there."

On redirect examination the witness said it was about twilight, about 6.15 P. M.; that he knew from going regularly to the races that automobiles came out of this gate from the club house inclosure; "that from his experience at the race track he knows that there is generally a traffic man there to guide the traffic; * * * that as he walked along there leaving the track, he looked to see if any automobiles were coming and did not see any and he partly depended upon the officer being there to look out for pedestrians as they came out." But on this occasion he saw no officer or any one directing traffic and that, so far as he knows, no other people were around him; that he was practically alone.

Dr. Steiner, who visited the plaintiff at the Havre de Grace Hospital, and who there attended Mr. Brown for the injuries he received, testified that he frequently visited the races and had parked his car in the clubhouse inclosure. He said it was difficult to get out of there, and that you could only do so by driving very carefully, and you have to stop at frequent intervals not to run into pedestrians; that there is an officer at the gate to admit you and one to let you out. He could not say there were two there, but he knew there was always one there. "That in driving a car the idea is to get to the main highway, and to drive a little ways and stop, and then to move forward a little more. That these were the usual conditions that existed at the race track, and that this condition existed on September 26th, 1932, to the best of his knowledge."

Reese M. Bowman, sheriff of Harford County, testified that in the evening after the races traffic through this section

where the accident happened is directed by a man in the Pinkerton uniform. He helps to park your car and helps you get out of there, and as sheriff he frequently came in contact with them (the Pinkertons). He does not think the state police have anything to do with the traffic until it comes out on the main highway. To that point the control and direction of the traffic is under the Pinkerton force. That there is only one attendant at the exit gate. He never heard of any one else being hurt there except Mr. Brown.

Harold R. Dickey, called as a witness by the defendant, testified that he was a resident of Baltimore and that he attended the races at Havre de Grace on the afternoon of September 26th, 1932, going there by automobile; that with him was his wife, Mrs. Carey, and Mr. Dupuey, all of whom live in Baltimore. "They arrived at the race track about a quarter to two and parked his car in the club house enclosure. They stayed until after the last race, when they went out, got in his machine, and drove out this gate." In doing so he had to drive out this way (indicating) from in back of other machines, and then got out to the gate where one of the Pinkerton men was standing.

The witness then went to the blackboard and "marked with an X the spot where the Pinkerton man was standing, and * * * marked with a double 'X' the place where the accident occurred * * *; that there were several cars in front of him, he does not know how many or how many were in back of him, as all of his time was taken up in seeing what went on right in front of him. He did not look to the rear. That as he came to the gate, the man gave him a signal to come on, and he came out and had to stop on this concrete. He stopped again at the edge of the concrete walk, and a little beyond this concrete way Mr. Brown walked right into the right front fender. That just prior to that his car had been standing still. That the distance between his car and the car in front of him was about the length of the pointer, which was between eighteen or twenty inches. That traffic started to move, and he does not think the wheels of his car had made

one complete revolution when Mr. Brown came in contact with the fender. That his car was in first gear. That he saw several people standing there (indicating) and he did not know that a man had walked into his car. There wasn't any jar of any kind. He saw people walking there and trying to cut through the traffic, and Mr. Dupuey called his attention to the man walking into the machine. He immediately stopped; it didn't take a second because he was not going fast. That Mr. Brown was assisted up by one of the state officers, a sergeant, and Mr. Dupuey. That the other people kept on going and no one stopped. That he put Mr. Brown in his car and took him to the hospital in Havre de Grace. * * * That the nature of the roadway, where he has indicated the accident happened, is made of railroad cinders. That he saw the marks that the cinders made on Mr. Brown's face after the accident at the hospital."

On cross-examination, the witness testified that "from the point where he had marked on the plat where the Pinkerton officer waved him on to the point where his friend told him that he had struck a man, he was going very slowly, his wheels hardly turned and he stopped, stopped right at the edge of the concrete. That he didn't take any measurements and could not tell the exact distance. That he was completely off the concrete and had probably gone two car lengths. That he felt the car drop off the edge of the concrete. * * * There were several people on his right and naturally he was looking on all sides at the people coming through there, a tremendous crowd of people came through there. * * * That he saw the people there when he got the signal to go on and he knows that he saw a man come up against the car. Q. And that you didn't know that your car had come in contact with Mr. Brown until Mr. Dupuey told you about it? A. In a way I did not. Q. How did you know it? A. I saw the people there when I got the signal to go on, and I know that I saw a man coming up against the car. Q. In your direct testimony, you said that you didn't know that you had hit Mr. Brown, until Mr. Dupuey told you about

it. A. That is a little misleading. Q. Do you want to change that statement and say now that you did see the man when you struck him? A. I don't know that it is a fact that I hit him. Q. Did you or not see Mr. Brown walk into your car? A. Not Mr. Brown directly; no, sir. I told you that there were several people there and whether Mr. Brown walked into my car or not I did not know until after the accident happened."

Mr. Dickey further said that "the man who wayed him on was one of the Pinkerton officers. That he had seen him there frequently, and he waved the people back like he always does."

Mr. Raymond J. Dupuey "was sitting on the right-hand side of the front seat. That after the races they got in Mr. Dickey's car * * * and right outside the gate they had to wait for traffic to move on. There were several cars in front and several cars behind * * * and you had to wait your chance to get in line. The officer waved for them to come on, and Mr. Dickey had just started up when he called Mr. Dickey's attention to the fact that he had hit Mr. Brown. He had just touched him and he fell down. Mr. Dickey stopped right away, his wheels hardly making another turn. The witness jumped out and an officer came up, and they placed Mr. Brown in the automobile and took him to the Havre de Grace hospital. * * * When he got out of the car Mr. Brown was lying on the right side of the car alongside of the right-hand front fender. That the placed marked double 'X' (XX) on the plat is where Mr. Brown and the machine came in contact. * * * That Mr. Brown made no statement as to how the accident happened and said that he didn't see the machine. That the closest car in front of them was about two feet away."

On cross-examination Mr. Dupuey testified that he did not think that the wheels of the automobile made a full revolution after the signal was given by the officer before the machine came in contact with Mr. Brown. "It moved about two feet, when I hollered to Mr. Dickey." He could not say

whether the car struck him (Mr. Brown) or he walked into it. The officer was standing on the concrete when he signalled for the car to come on. At the time of the collision, Mr. Brown was on the cinders and not on the concrete. "Q. How was Mr. Brown traveling with reference to the way you were traveling—straight across your course, or across your course at an angle? A. There were so many people there and he stepped right out without giving any warning. * * * He stepped right out in front of us—there were a whole crowd of people there waiting to get by. Q. How many steps do you think you saw Mr. Brown make? A. He didn't make any—he stepped right out in front of us. * * * He made one (step) and hit the car. Q. What part of the car did he hit? A. The right front fender. Q. Where? A. On the side."

Mrs. Carey was seated "on the back seat on the left-hand side * * * she did not see the accident but heard Mrs. Dickey scream * * * Mr. Brown was put in the back seat and they took him to the hospital * * * that he said he did not see the car. * * * That there were automobiles directly in front of Mr. Dickey's car. That every one was trying to get into line and that they were moving slowly and would stop and start."

Mrs. Martha Dickey was seated "on the right-hand side of the back seat." She testified that "people were walking along and that some car in front of them stopped and they stopped. She saw the officer wave to come on and Mr. Dickey started, and a man popped up in front of the car and it looked like he was going to step in front of the car. The car was just off the little walk way and it looked like the car was going to hit him, and she hollered and Mr. Dupuey hollered. That she is familiar with the general conditions at the scene of the accident, knows where the concrete is and where the gate is, and where the cinders are. That the accident happened just off the concrete. That Mr. Brown was over in the cinders and when he was picked up his face was full of cinders. That from where she was sitting, it looked like the side of the right front fender struck Mr. Brown. That she and Mr. Dupuey got out and Mr. Dupuey and a state officer helped get Mr. Brown in the car, and that she drove to the hospital

on the front seat with Mr. Dupuey and Mr. Dickey. That Mr. Brown said that he never saw the machine at all. That there was another machine directly in front of their car and imagines there were cars behind them as the enclosure was packed with cars, but she did not look back."

On cross-examination she testified that "she saw the Pinkerton officer, who was standing right back of this double gate, about where Mr. Dickey put the 'X' mark. That she noticed him as they came out. That that was the officer who motioned to her husband. That she cannot say how far the car moved after Mr. Dickey got that signal, but she knows that when they reached the edge of the concrete the state officer was giving the signal to come on, and the state officer was at the entrance to the main driveway, and she saw him give the signal to come on before the accident."

The witness was asked by the court: "Q. Do you know the exit from the parking place for the club house members? A. Yes, sir. Q. You went through that gate? A. Yes, sir. Q. It was through this gate that some Pinkerton officer waved you on? A. There was one right outside the gate; and, after we passed him, the state police waved us to come on. Q. You got signals from both of them? A. Yes, sir." But this witness cannot say "that she saw Mr. Brown before he was struck by the car. That there was more than one man there and she cannot say that she noticed Mr. Brown before the accident. That there were a lot of people there and she did not notice any one in particular. That there were a lot of men and she did not know one from the other, but that the man who was picked up and put in their car was Mr. Brown. That she could not say especially she noticed Mr. Brown before the accident as there were a dozen men there."

On redirect examination the witness testified that she saw "the officer standing at the gates when they came out of the club house enclosure and there was also a state officer where you come out of the main road proper. That they had passed the man standing at the gate. That there was one car in front of them and another car in front of that, and she cannot say for sure whether that car kept on, but when Mr.

Dupney and the state officer lifted Mr. Brown up and put him in their car, she does not think there was more than one car ahead of them. * * * That they had already passed the man back here (indicating), before the accident happened."

It is charged in the declaration that "the defendant negligently and carelessly permitted and invited an automobile being then and there operated by one H. R. Dickey to leave the club house enclosure on said grounds, and cross the paved footway provided for pedestrians whereon this plaintiff was then and there walking," and by which he was struck and knocked down.

The plaintiff, who at the time of the accident was seventy-four years of age, had always lived within a few miles of the defendant's fair grounds, and had been a regular visitor ever since it was opened. He was thoroughly familiar with the grounds, including the club house, the concrete walk for pedestrians leading from the highway to the club house, and the entrance to the grounds. He was also familiar with the club house inclosure, in the rear of the grand stand and separated from the concrete walk by a high wire fence in which there was a gate, through which automobiles passed in going from the inclosure to and across said walkway. He knew that persons whose automobiles were parked in the club house enclosure passed through that gate and crossed the walkway in leaving the grounds after the races were over; and, as stated by him, he knew that officers were generally stationed there to direct the traffic, but on this occasion he did not see any officer. If an invitation was given, or signal made, by the officer to the driver of the car mentioned, to come out of the gate and cross the walk, he, of course, did not see it. He stated in his evidence that, while on the concrete walk, and in line with the gate, he looked to the left (in the direction of the gate) to see if any automobiles were coming, as that was the only direction from which the cars would come, and did not see anything, although it was light enough for him to see fifty yards from him; he did not see any automobiles at all in the parking space or coming out. He never saw any line of cars, "sometimes stopping and sometimes moving

very slowly, as there were not any cars there." He was hit, but by what he does not say, and, after he was hit, he did not "know anything more until he was in the hospital."

Harold R. Dickey, a witness for the appellant, and the driver of the car which was in collision with the plaintiff, and by which the latter was injured, testified that, as he approached the gate mentioned, the officer, a Pinkerton man, gave him a signal to come on, and at the same time "he waved the people back as he always does. That when told to come on he did so and passed out the gate, but had to stop on this concrete." He had to stop again on the edge of the concrete, and a little beyond this concrete way Mr. Brown walked into the right-hand fender. The action of the officer in giving to the driver of the automobile the signal to come on was that of a traffic officer, who in this case directed the automobile driver to move on while he at the same time directed the pedestrians not to proceed further, but to remain where they were, for the time being. This direction of the officer cannot be said to constitute negligence. It was, on the contrary, a precautionary measure to prevent danger and accidents to both the pedestrians and the drivers of automobiles in leaving the grounds of the defendant. The testimony of other witnesses, which has been fully set out, corroborates Mr. Dickey as to how the accident occurred, and we will not unnecessarily prolong this opinion by further reference to it.

The defendant was not the insurer of the safety of the plaintiff while upon its premises and grounds, but it owed to him the duty of exercising ordinary care and prudence to render the premises reasonably safe for his visit. *Kann v. Meyer,* 88 Md. 541, 41 A. 1065; *Wise v. Ackerman,* 76 Md. 375, 25 A. 424; *Lorentz v. Robinson,* 61 Md. 64; *Benson v. Baltimore Traction Co.,* 77 Md. 539, 26 A. 973; *State Fair v. Henderson,* 164 Md. 587, 165 A. 698; *Hochschild, Kohn & Co. v. Murdoch,* 154 Md. 575, 141 A. 405; *Isaac Benesch & Sons v. Ferkler,* 153 Md. 683, 139 A. 557.

If the condition requiring the automobiles, in leaving the grounds of the defendant, to cross over the concrete walk

used by the pedestrians was a dangerous condition, which we do not decide, it is nevertheless apparent from plaintiff's testimony that that condition had existed for many years, and that the plaintiff was as well aware of the condition as the defendant, yet he assumed such risk willingly day after day during his many years of attendance at the race track.

It is said in *Texas Co. v. Wash., B. & A. R. Co.,* 147 Md., at page 173, 127 A. 752, 754: "The mere ownership of land or buildings does not render one liable for injuries sustained by persons who have entered thereon or therein; the owner is not an insurer of such persons, even when he has invited them to enter, nor is there any presumption of negligence on the part of an owner or occupier merely upon a showing that an injury has been sustained by one while rightfully upon the premises. The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted. * * * And hence there is no liability for injuries from dangers that are obvious, or as well known to the person injured as to the owner or occupant." *Fulton Bldg. Co. v. Slichel,* 135 Md. 542, 109 A. 434; 20 *R. C. L.* 56, par. 52.

The record discloses in our opinion no evidence of negligence on the part of the defendant legally sufficient to go to the jury, and the trial court was, we think, in error in refusing the defendant's B prayer to take the case from the jury. The judgment will therefore be reversed, without a new trial.

*Judgment reversed, without a new trial, appellee to pay the costs.*