## O'KEEFE v. CHEYENNE CHAMBER OF COMMERCE

(No. 2147; September 12, 1940; 105 Pac. (2d) 279)

For the appellant, there was a brief by *Greenwood* and *More* of Cheyenne, and oral argument by *Mr. Greenwood*.

For the respondent there was a brief and oral argument by *Albert D. Walton* of Cheyenne.

Riner, Chief Justice.

Pattric Ruth O'Keefe, as plaintiff below and appellant here, brought her action in the district court of Laramie County against the Cheyenne Chamber of Commerce as defendant and respondent in this proceeding, seeking to recover for personal injuries alleged to have been incurred by her as a result of asserted negligence on the part of the defendant. The case was tried by the court aforesaid, with a jury in attendance, and at the conclusion of the trial the jury was instructed by the court to bring in a verdict in favor of the defendant. Judgment was duly entered upon this verdict. As already indicated the cause was brought here by direct appeal. The only question involved is whether there was sufficient evidence which required the case to be submitted to the jury. The proper solution of this problem requires a consideration of the claimed negligence in connection with the submitted proofs of the parties. As to these matters the record discloses as follows:

The defendant aforesaid, a Wyoming corporation, conducts each year, on grounds which it exclusively controls and which were and are inclosed, a show generally known as "Frontier Days." This show consists of horse racing, the riding and roping of wild horses and cattle, features common to a type of western exhibition known as a rodeo, with other amusement features. The public in general is invited, but each person attending said show is expected and required to pay an admission fee thereto in order to obtain entrance to the grounds upon which it is conducted. These grounds were and are surrounded by wire fencing, in which are located certain gates for the admission and convenience of those attending the exhibition. There were and are two southerly gates, the easterly one, which we shall designate "A", designed for the admission and convenience of busses, taxicabs, police cars and concession trucks. The other southerly gate, which

may be designated "B", was and is designed to be used as an exit gate by this class of traffic.

On the west side of these grounds were and are also two other gates, the most southerly of which was and is the main entrance gate, which shall be referred to herein as "C", and the other hereinafter designated as "D". The entrance last mentioned was for the admission of cowboys, contestants in the races, etc., and the horseback riders to the large corral opposite a steel grandstand which was designed for the paying guests of the show. This grandstand was erected upon the premises and equipped with seats ,to which attending guests were permitted to purchase tickets and thereby to enter the inclosed grounds and occupy same during the performance for which these tickets were purchased. In order to gain entrance to this grandstand after being admitted within said inclosure, each person holding an admission ticket was required to present same at certain so-called pedestrian gates located within said inclosed area but established in a wire fence that is placed at the rear of said steel grandstand and in front of its several entrances and exits. Passing through these pedestrian gates the holders of tickets obtained entrance into the grandstand to the seats for which they had paid.

The steel wire fence in which these pedestrian gates are placed runs lengthwise approximately north and south, paralleling the rear of said grandstand. Immediately west of the steel wire fence just mentioned there was maintained and set apart by the defendant a tract of ground about 150 yards wide, running in an easterly and westerly direction and about 750 yards long, running in a northerly and southerly direction, within which guests entering said grounds inclosed by the general fence first above referred to were required to park their automobiles and then walk to one of the pedestrian gates already described. The south bound-

ary of this parking area ran parallel with the south side of said interior steel wire fence located at the rear of the steel grandstand aforesaid, as already indicated. The defendant required automobiles in said area to be so arranged as to leave lanes with room between the rows of parked cars, within which lanes pedestrians might walk. These lanes ran approximately north and south in direction, with the first or easterly lane located between said interior steel wire fence and the first row of parked automobiles, this lane being about 6 feet in width.

On July 30, 1937, when the annual 1937 Frontier Days show was being held and about 1:30 P. M., the plaintiff, having paid the necessary admission fee to defendant and thereby being in possession of a ticket to a seat in the grandstand, was admitted into the general inclosure grounds through the westerly main gate "C" aforesaid in an automobile and was directed by the defendant's employees in the parking of said vehicle in the particular space hereinabove described. She was thus entitled to be admitted through one of the pedestrian gates to occupy a seat in the grandstand and witness the show. While standing in a line of pedestrians to the west of one of the gates leading through said interior fence to the grandstand already described and waiting her turn to be admitted through said gate, plaintiff was suddenly, and, as she testified as a witness in her own behalf "struck with terrific force," knocked violently to the ground and injured by a horse running in a northerly direction along one of the lanes next to the cars, to which reference has already been made. This unfortunate occurrence was brought about thus:

Two women, a Mrs. Ringling and a Mrs. DeForge, about 1:30 P. M. on the date last above mentioned, desirous of attending the Frontier Days Show on horseback, stopped at what was known as "Bell's Riding

Academy," which was located several hundred yards from the southerly entrance "A" to the general inclosure of the grounds already described. At this Riding Academy these two young women procured horses for themselves. Mrs. Ringling, as a witness for the defendant, testified that at first she received "quite a large white horse" and she had "just barely got started" and had turned to wait for her companion when the horse Mrs. Ringling was riding "turned back to the stables and I could not stop her." There was at that time another girl at the Riding Academy aforesaid who likewise had rented a horse and who offered to and did trade animals with Mrs. Ringling, who then received and rode a dark bay horse. Having obtained their mounts the two women, Mrs. Ringling and Mrs. DeForge, started riding them toward the Frontier Days Show grounds, the woman on the white horse starting out in the same direction also but some distance back of them. About half way to the grounds the white horse with its rider ran past Mrs. Ringling's animal and came so close that, as Mrs. Ringling testified, it "hit mine and jerked one stirrup on it and frightened my horse," and then the animal that Mrs. Ringling was riding "tore off after the other horse," Mrs. Ringling being unable to hold him back. He then followed the other horse directly into the Frontier Days grounds through the southerly gate designated as "A". As they went through that gate there were fifteen feet between the two animals.

One Sprague, also a witness for the defendant, testified that on July 30, 1937, he and a man named Brolliar went to work at 9:30 A. M. as guards at gate "A" at Frontier Park and worked until after the show was over around 6:00 o'clock P. M.; that the entrance through said gate is 15 feet wide; that by the authorities in charge of guards at the several gates of said Park he was instructed to admit only busses, taxicabs,

police cars and concession trucks, and he accordingly admitted that class of traffic through that gate; that he saw certain horseback riders go through said gate about 1 :30 P. M. on the date last mentioned; that when they started through said entrance he was in front and about the middle of it; that in order to prevent them from entering that gate he "jumped in front of them and threw up both hands as they came across the road toward said gate; that he had in his hands at that time a short stick of wood; that the horses and riders did not stop so "I had to jump out of the way"; that they were not going slow but were not going as fast as they could; that he was about a foot from the horses when he jumped aside; that he watched the horses and their riders go on about half way towards the gate "E", designated on a map in the record as the "Concession Gate," placed in the wire fencing at the rear and connecting with the southerly side of the seating arrangements to admit conveyances for the convenience of those who sold articles at the show as concessionaires. Thereafter he (Sprague) had business at the gate which took his attention. On cross-examination he stated that he had told defendant's official who gave him his instructions that he needed more help than he had to handle the gate. The record is devoid of proof that his request was made in apprehension of any such situation as arose herein.

Mrs. Ringling further testified that as they went through gate "A" they called to warn people and the man at the gate "took it up" and jumped aside as they went through the gate and the lane cleared as people went from side to side; that two girls got in the way of the leading horse and rider and were knocked down by them; that she does not remember cars on the side of Frontier Park, but there were cars on the other side; that she was all this time trying to stop her horse and it was still out of control as it went through

the pedestrian lines in front of the gates through the interior fencing and continued so until almost to the northerly end of the inclosure behind the grandstand, at which place some man stepped out and caught its bridle.

This testimony given by Mrs. Ringling was not disputed. Indeed, it was corroborated by plaintiff's witness Mr. Gus Fleischli, who was working at one of the pedestrian gates aforesaid, saw the accident happen and picked up the plaintiff after she had been knocked to the ground. In the course of his direct examination he stated: "Well, I was standing about 20 feet back of the gate where the pedestrians came in, and I saw these two horses coming up the runway behind the first row of cars. And I vividly remember seeing a girl riding one, and she attempted to pull the horse down and couldn't make it, and just in the excitement I hollered, 'Look out!' although no one heard me, as I was too far back; and the horse crashed right through the aisle where the customers were coming across the gravel to get into the gate, and it struck the two girls; and I reached out and picked one of them up and carried her into the first aid tent that the Scouts had there, and went right back and got the other one and helped her into the first aid tent." Concerning the speed of the horses he said: "They were galloping, both of them." And again, "They were traveling pretty fast. The front one was pounding his hoofs as if he was going pretty fast; he was traveling." He also gave answers as questions were put to him as follows:

"Q Do you have any recollection as to the person who was on that horse?
A I saw a distressed look upon a girl's face, trying to hold the horse in, but she couldn't. Then she flashed by.
Q Did you see both horses as they went through there?
A Yes.

Q Do you know where they went after they passed by?

A No. I looked and they were still going when I went to pick up the girl."

The plaintiff contends that it was negligence on the part of the defendant to rely entirely upon guards stationed at gate "A" for the protection of guests within the inclosed area of the Frontier grounds, as the defendant knew, or should have known, that horses were likely to enter such area; that the defendant failed to have sufficient guards at gate "A" to prevent horseback riders from entering that gate, although the defendant had received notice from the man in charge thereof that they needed more help "to handle" said gate; and that defendant's employees in charge of this south main gate "A" failed to exercise reasonable care in excluding horseback riders from entrance through said gate.

The rule governing a trial court in this jurisdiction relative to the direction of a verdict by a jury called in a case is as stated in Calkins v. Wyoming Coal Mining Co., 25 Wyo. 409, 171 P. 265:

"When it clearly appears to the trial court that upon the evidence produced (and this includes the entire evidence in the case when the motion for a directed verdict is submitted after the introduction of evidence by parties other than the plaintiff; see Harris v. Schoonmaker, 50 Wyo. 143, 60 P. 2d 360, on petition for rehearing), giving to it its full probative force, together with all reasonable inferences deducible therefrom, it fails to establish in law a claim, or defense, it is not only the right but the duty of the court to so instruct the jury."

The following authorities briefly reviewed indicate the rules which should ordinarily be applied in the disposition of charges of negligence under circumstances such as are presented before us in the case at bar.

3 C. J. S. 395, Section 14, citing many well considered cases, says that:

"An agricultural society, holding a fair or exhibition, is not an insurer of the safety of those invited on the premises; but it must use reasonable care to prevent their injury and must see to it that those parts of the grounds to which the public is admitted are reasonably safe, if necessary by furnishing adequate appliances for the prevention of injuries that can reasonably be foreseen or by stationing guards to warn the public."

In Barton v. Pepin County Agricultural Society, 83 Wis. 19, 52 N. W. 1129, it appeared that the defendant association permitted private teams to be driven around the race course after the races had been run. The driver of a team of young horses whipped them when, instead of trotting, the colts broke into a run. They had just previously trotted around the track twice. As a result of their driver's action he lost all control over the animals and they ran away, turned off the track and injured the plaintiff, a visitor at the fair, who had started toward the gate to the fair grounds where these races were being held, said plaintiff being then off the race track. Reversing a judgment for the plaintiff the appellate court, among other things, pointed out that:

"First. It appears very conclusively that the proximate, if not the only, cause of the injury, was the whipping of these young horses, causing them to run away, by Todd, the driver. If he had not whipped them, and had not thereby lost all control over them, it is not at all probable that they would have left the track; and it is to be presumed that he would have so driven them as to have caused no injury to any one. Second. This was the only cause of the injury. The custom, or the tacit permission of the officers of the society, for teams to be driven around the race track after the races were closed had nothing to do with this injury, for they did not cause injury to any one. Nor did they cause the injury by not preventing Todd from driving his team around the race track, because the injury was not the natural or direct consequence of his merely driving

around the track, and keeping within it; and there was no reason to anticipate or expect any such result from it. The driving around the track and keeping within it by Todd neither caused the injury nor would or could have caused it. The runaway team left the track, and thereby caused the injury. Their running away was caused by Todd, and not by the officers of the society, or by their negligence. The officers of the society might as reasonably be charged with liability for this injury because they did not prevent Todd coming to the fair on that day, as that they did not prevent the people from driving around the race track after the races were closed, or that they did not prevent Todd's team running away, or for any other remote, pretended acts of negligence that caused no injury to the plaintiff, or any one else, or that could have reasonably been expected to cause any. These comments on the evidence appear to be reasonable, as preliminary to the question of law. * * * * * * While the team was under the control of the driver it is probable that they would have kept within the track, and would not have been allowed to run against the plaintiff close to the fence, several steps out of the track. No one could have reasonably anticipated that Todd would have done such an unreasonable and dangerous thing as to whip his young horses into running away at the time and under the circumstances. After Todd lost control of his team, then no one could have possibly prevented the accident; and no one except Todd was responsible for it."

The case of Williams v. Dean, 134 Iowa 216, 111 N. W. 931, held that the directors of a county fair association were not liable for mere nonfeasance in failing to more securely protect patrons of a grandstand from injuries by a wild ball pitched or batted in the course of a baseball game, which was one of the amusements of a county fair held by them, which resulted in injury to the plaintiff who was an occupant of such grandstand and who had paid an admission fee to view the entertainment.

In Oles v. Columbia County Agricultural Society, 236 App. Div. 569, 260 N. Y. S. 863, the facts were briefly

that the defendant society permitted a concessionaire to rope off an area for a pony track and ponies were kept there which were looked after by attendants. Children admitted to the fair who paid the concessionaire for the privilege were allowed to ride upon the ponies. The plaintiff, a child under four years of age, with its mother, attended the fair and rode upon one of the animals. The ride was taken in the mother's presence, with her consent, and was paid for by another member of the child's family. The pony ridden became unruly and threw the child, causing injuries for which a judgment was recovered upon the trial of the case. Reversing this judgment the reviewing court used this language:

"The defendant owed plaintiff the obligation to keep the fair grounds in a reasonably safe condition. Roper v. Ulster County Agricultural Society, 136 App. Div. 97, 120 N. Y. S. 644; Fox v. Buffalo Park, 21 App. Div. 321, 47 N. Y. S. 788; Thomas v. Saratoga Association for the Improvement of the Breed of Horses, 226 App. Div. 706, 233 N. Y. S. 909. This obligation would require defendant to exercise reasonable care to prevent the exhibition, use or handling, without necessary safeguards like hobbles, cages, or barriers, of animals known to be dangerous or liable to injure persons. This would not apply to a domesticated pony. Without proof that defendant's officers had knowledge of the pony's vicious tendencies, no liability existed. There had been no previous accidents. Plaintiff's mother saw that the ponies were being led by the boys. Any danger incident to a ride under such conditions was as obvious to her as to the defendant. There was no danger known to defendant's officers which was hidden from the mother. If she was negligent, it was imputable to the plaintiff."

In Harford Agricultural & Breeders' Ass'n. v. Brown, 166 Md. 262, 170 A. 782, the facts in outline were that a pedestrian leaving the defendant Agricultural Association's race track after the conclusion of

the races held thereon was struck and injured while walking on a concrete footway located upon the premises under control of said Association, and these injuries were caused by an auto which was also leaving the race track, which automobile had been directed to proceed by an official of the defendant who at the same time had waved pedestrians back out of the way. Determining that there was no liability on the part of the Association and reversing a judgment for the plaintiff this was said:

"The action of the officer in giving to the driver of the automobile the signal to come on was that of a traffic officer, who in this case directed the automobile driver to move on while he at the same time directed the pedestrians not to proceed further, but to remain where they were, for the time being. This direction of the officer cannot be said to constitute negligence. It was, on the contrary, a precautionary measure to prevent danger and accidents to both the pedestrians and the drivers of automobiles in leaving the grounds of the defendant. The testimony of other witnesses, which has been fully set out, corroborates Mr. Dickey as to how the accident occurred, and we will not unnecessarily prolong this opinion by further reference to it.
"The defendant was not the insurer of the safety of the plaintiff while upon its premises and grounds, but it owed to him the duty of exercising ordinary care and prudence to render the premises reasonably safe for his visit." (Citing many Maryland cases.)

Where the plaintiffs sued an agricultural fair association to recover for personal injuries suffered by a Mrs. James as a result of alleged negligence of the defendant, the facts were substantially these in the case of James v. Columbia County Agricultural, Horticultural & Mechanical Ass'n., 321 Pa. 465, 184 A. 447: The defendant was the proprietor of certain fairgrounds and conducted the annual county fair thereon. The plaintiffs were visitors on September 25, 1930, at

the fair in progress then. The horse races as part of the entertainment provided for visitors had begun. During the course of the first race a horse fell, threw its rider, got up and ran, riderless and uncontrolled around the half mile track two or three times, finally jumping the fence which surrounded the track and striking Mrs. James, who was not a spectator at the races, but who was walking with her husband along one of the roadways within the fairgrounds.

Plaintiffs charged the defendant with negligence (1) in allowing the race to be run on a muddy, slippery track; (2) in failing to maintain a fence of sufficient height and strength to keep the horse within the race course; and (3) in failing properly to police and marshal the track.

After considering the other charges of negligence and holding them not supported by the evidence, the Supreme Court of Pennsylvania spoke as follows:

"Defendant's secretary testified that there was a marshal but that he did not see him about the track at the time of the runaway. He also admitted that it would be the marshal's duty to do what he could in the event of an accident. It does not appear, however, that it was any part of that official's ordinary duties to stop runaway horses. But whether or not the course was properly marshaled is really immaterial in view of the fact that plaintiffs failed to establish any causal connection between the alleged inadequate marshaling and the injuries sustained. The proximate cause of the injury to Mrs. James was the runaway horse and no negligence of defendant was responsible for the runaway. A recovery may not be founded upon the mere conjecture that with proper marshaling the horse could have been halted. The marshal may be, as one of plaintiffs' witnesses testified, the 'boss of the track,' or he may be merely the official to call out the horses for the various events, but, in either case, it is impossible to say that his presence and aid would have prevented

the accident. Plaintiffs not only failed to prove their charge of improper marshaling, but they also failed to show that the injuries suffered were the proximate consequence of that alleged negligence on defendant's part."

Although the plaintiffs had recovered a judgment upon the trial and this had been affirmed on review by the Superior Court, nevertheless the judgment was reversed and a judgment entered for the defendant. It may be noted that two judges expressed their dissent as to the result reached because in their view of the matter they considered the race track to have been improperly marshaled.

See also Hallyburton v. Burke County Fair Ass'n., 119 N. C. 526, 36 S. E. 114; Good v. Michigan Farm & Industrial Fair, Inc., 270 Mich. 543, 259 N. W. 149; Hart v. Washington Park Club, 157 Ill. 9, 41 N. E. 620.

With the light upon the instant case shed by these authorities we are inclined to think that the action of the trial court in directing a verdict in defendant's favor was correct. The proximate cause of the regrettable accident was no act of the defendant, but the running away of the white horse, as testified to by Mrs. Ringling. It would seem from the record before us that if they had been able to do so, undoubtedly the woman on the white horse and Mrs. Ringling would have stopped without the main south gate "A" when warned so to do by the attendants there. The action of the white horse, which struck the plaintiff to the ground, could hardly have been foreseen by the defendant. Animals such as these ladies were riding are not ordinarily dangerous. (See Redmond v. National Horse Show Ass'n., 138 N. Y. S. 364, a case cited by the appellant, and Oles v. Columbia County Agricultural Society, supra.) It is common knowledge that horses are ridden in the Frontier Days rodeo parades and have been so ridden for many years without injury

to any one. It may be observed also that there is no testimony in this record that the animals these ladies were riding were wild or unruly horses and known by the defendant to be so. So far as appears, also, their riders did their best to control them but failed. The defendant's agents in charge of the south main gate "A" endeavored strenuously to prevent their entry upon the inclosed grounds aforesaid, but were compelled to get out of the way in order to avoid being subjected to the same treatment as plaintiff experienced and one of these guards barely escaped injury. So far as the record shows all these riders and horses were in fact trespassers on defendant's grounds when the accident in question happened, for it appears that two of the riders got their tickets entitling them to enter upon the grounds after Mrs. Ringling's horse had been brought under control by a man seizing its bridle.

It does not appear either that if more agents of the defendant had been placed at the south main gate the accident would not have occurred. If more assistants had been supplied for aught that appears, the additional help would have been unable to stop these animals going through that gate. It can hardly be held that liability on the part of the defendant should be predicated on conjecture merely. The case at bar in view of its facts is obviously much stronger for the defendant than the James case reviewed above. There no efforts at all were apparently made to stop the runaway riderless horse, as has already been noted. Here not only the riders themselves endeavored to stop their mounts, but the defendant's agent at the gate risked his own safety in an endeavor to prevent the horses going through the entrance. Other questions as to the admission of evidence are argued and submitted by counsel, but in the views entertained by the court as

188

hereinbefore expressed, it becomes unnecessary to lengthen this opinion by reviewing these matters.

We accordingly conclude that the judgment of the district court of Laramie County grounded upon the directed verdict for defendant should be affirmed.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.